[Cite as *State v. Reed*, 2025-Ohio-4708.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240530 |
| | | TRIAL NO. B-2401359 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| KYLAP REED, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 10/10/2025 per order of the court.**

**By:**_____
 **Administrative Judge**

[Cite as *State v. Reed*, 2025-Ohio-4708.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240530 |
| | | TRIAL NO. B-2401359 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| KYLAP REED, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 10, 2025

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Norbert Wessels,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Sarah E. Nelson*, Assistant Public Defender, for Defendant-Appellant.

PER CURIAM.

{¶1} In March 2024, defendant-appellant Kylap Reed was indicted for carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a felony of the fourth degree. Reed was 19 years old at the time, so Ohio law did not consider him a "qualifying adult" who "shall be deemed to have been issued a valid concealed handgun license." *See* R.C. 2923.111(C)(1)(a); R.C. 2923.111(A)(2)(a) ("'Qualifying adult' means a person who is . . . [t]wenty-one years of age or older . . . .").

{¶2} Reed moved to dismiss the indictment, arguing that it violated his right to keep and bear arms protected by the Second and Fourteenth Amendments to the United States Constitution and Article I, Sections 1 and 4 of the Ohio Constitution. The trial court denied the motion, and Reed changed his plea from "not guilty" to "no contest." The trial court accepted the plea, found Reed guilty, and sentenced him to two years of community control and a $100 fine.

{¶3} Reed now appeals, raising a single assignment of error: "The trial court erred in denying Mr. Reed's motion to dismiss." In substance, he argues that both the state and federal constitutions prohibit the State from prosecuting 18-to-20-year-olds for carrying concealed weapons.

{¶4} As a threshold matter, we reject Reed's challenge under the Ohio Constitution as squarely foreclosed by binding precedent. The Ohio Constitution provides that "[t]he people have the right to bear arms for their defense and security." Ohio Const., art. I, § 4. In *Klein v. Leis*, 2003-Ohio-4779, ¶ 15, the Ohio Supreme Court held that "there is no constitutional right to bear concealed weapons" under the Ohio Constitution, and so categorically upheld Ohio's concealed-carry statute, R.C. 2923.12. The Ohio Supreme Court has not overruled this authoritative interpretation of our state constitution, so we are bound by it. The State's application of R.C. 2923.12 to

Reed does not violate Ohio Const., art. I, § 4.

{¶5} Further, we conclude that the Second Amendment, as construed in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), does not preclude the State's prosecution of Reed for carrying a concealed weapon. The State has adequately demonstrated that, as applied to Reed, R.C. 2923.12 "is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi* at 692, quoting *Bruen* at 29.

{¶6} Because we hold that the State's prosecution of Reed was permitted under both the state and federal constitutions, the trial court did not err in denying Reed's motion to dismiss. We therefore overrule Reed's sole assignment of error and affirm his conviction.

Judgment affirmed.

**MOORE, J.,** concurs.
**CROUSE, P.J.,** concurs separately.
**BOCK, J.,** concurs in part and dissents in part.

**CROUSE, P.J.,** concurring separately.

{¶7} I concur in the court's decision affirming Reed's conviction. I write separately to further explain why I believe the logic of *State v. Hall*, 2025-Ohio-1644 (1st Dist.), supports the court's per curiam holding that the State's application of R.C. 2923.12(A)(2) to Reed falls within our Nation's history and tradition of firearms regulations, and therefore within *Bruen*'s construction of the Second Amendment.

{¶8} But first, I feel it necessary to address the State's argument that laws eliminating the firearm rights of 18-to-20-year-olds based on age alone are "historically rooted" and therefore constitutional. The State bases this assertion primarily on founding-era conceptions of legal "infancy" and offers numerous examples of how the rights of those under age 21, which was the age of majority at that

time, were severely restricted during the founding era. The State asserts that this history demonstrates that "those under the age of majority were considered untrustworthy with dangerous weapons." Therefore, the State argues, it is constitutional to restrict all gun rights of 18-to-20-year-olds, even though "Ohio does not go that far" by only restricting their ability to carry concealed.

**{¶9}** Because I believe the State misreads the history in this regard, I would reject this proposition as a ground for finding the 18-to-20-year-old concealed-carry ban constitutional.

**{¶10}** To start, I could find no laws prior to the 1880s that prohibited infants from *possessing* firearms. The State certainly has not offered us any. The earliest such prohibition I have seen comes from over a decade after the ratification of the Fourteenth Amendment. *See* Act of Apr. 3, 1883, 1883 Wis.Laws 290, Ch. 329, § 1-2[1] (making it illegal for minors to go armed with pistols or revolvers); *see also* Walsh & Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 Minn.L.Rev. 3049, 3092-3093 (2024)[2] (table of age-based gun restrictions in the 19th century).

**{¶11}** Laws prohibiting third parties from furnishing arms to minors are of an earlier vintage—but only slightly. Although the State cites none of these statutes directly, it does rely on *State v. Callicutt*, 69 Tenn. 714 (1878), which approved an 1856 statute that made it a crime to "sell, loan, or give, to any minor, a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife." *See* Act of Feb. 26, 1856, 1856 Tenn.Acts 92, Ch. 81, § 2.[3] The State fails to note, however, that statute's proviso that

---

[1] Available at https://docs.legis.wisconsin.gov/1883/related/acts/329.pdf.
[2] Available at https://minnesotalawreview.org/article/age-restrictions-and-the-right-to-keep-and-bear-arms-1791-1868/.
[3] Available at https://hdl.handle.net/2027/nyp.33433006455293?urlappend=%3Bseq=118. The

it "shall not be construed so as to prevent the sale, loan, or gift to any minor of a gun for hunting." *Id.* I have seen a handful of other such laws from this period, but none earlier than 1856. *See generally* Walsh & Cornell, 108 Minn.L.Rev. at 3092-3093.[4]

**{¶12}** Despite the lack of historical twins, I still think it likely that the disabilities associated with infancy could be read to suggest a historical tradition of restricting the firearm rights of those analogous to founding-era "infants." As a legal category, "infants" included individuals up to the age of 21 at the founding and into the 19th century. *See* 1 Blackstone, *Commentaries on the Laws of England*, 454 (1765);[5] 1 Bouvier, *Institutes of American Law*, § 363 (1854)[6] (noting that the "rule that a man attains his majority at the age of twenty-one years accomplished, is perhaps universal in the United States"). Infants were deemed unable "to take care of themselves," so that "[d]uring the minority of the child," a "parent [was] absolutely bound to provide reasonably for [the infant's] maintenance and education." 2 Kent, *Commentaries on American Law*, 191 and 161 (1827).[7] In return, the parent was "entitled to the custody of their persons, and to the value of their labour and services." *Id.* at 162-163.

**{¶13}** It was only once an individual "attain[ed] his majority at the age of twenty-one years accomplished," that he came into "the full enjoyment of his civil and political rights." 1 Bouvier, *Institutes*, at § 363. Prior to that time, infants lacked the

---

*Callicutt* opinion discusses the version of this statute codified at Tenn.Code 4864, at 871 (1858), available at https://hdl.handle.net/2027/mdp.35112103368272?urlappend=%3Bseq=907.

[4] And these post-1856 laws were sporadic and varied from state to state. Some, for example, did not include Tennessee's "hunting" exception. *See, e.g.*, Act of Feb. 2, 1856, 1856 Ala.Laws 17, No. 26, § 1, available at https://archive.org/details/alabama-acts-1855-1856/Acts_1855_1856. And others applied only to individuals below the *age of 16*, leaving adults free to provide arms to children 17 and up. *See, e.g.*, Act of Feb. 4, 1881, 1881 Fla.Acts 87, Ch. 3285 [No. 67], § 1, available at https://heinonline.org/HOL/P?h=hein.ssl/ssfl0255&i=87; Act of June 10, 1881, 1881 Pa.Laws 111, 111-112, No. 124, § 1, available at https://hdl.handle.net/2027/uc1.a0001822782.

[5] Available at https://archive.org/details/BlackstoneVolumeI/page/n456.

[6] Available at https://archive.org/details/cu31924018830533.

[7] Available at https://books.google.com/books?id=_PFBAAAAYAAJ.

ability to participate in the legal and economic life of the community. Their "legal existence . . . was subsumed under their parent or guardian's authority." Walsh & Cornell, 108 Minn.L.Rev. at 3067-3068. Infants generally lacked capacity to make binding contracts. *See* 1 Blackstone at 454 (an infant could "neither aliene his lands, nor do any legal act, nor make a deed, nor indeed any manner of contract, that will bind him"); 1 Bouvier, *Law Dictionary*, 501 (1839)[8] ("In general an infant is not bound by his contracts, unless to supply him for necessaries."). Exceptions were made for "necessaries," but these did not include firearms. *See* Walsh & Cornell, 108 Minn.L.Rev. at 3065; Cornell, *Common-Law Limits on Firearms Purchases by Minors: The Original Understanding*, 173 U.Penn.L.Rev.Online 133, 134 (2025);[9] *Saunders, Glover & Co. v. Admr. of the Estate of Ott*, 12 S.C.L. (1 McCord) 572, 572 (S.C.Const.Ct. 1822)[10] (holding that items "such as liquor, pistols, powder, . . . &c." were not "necessaries for an infant" for which an infant might contract).

{¶14} In sum, infants "were subject to the power of their parents and depended on their parents' consent to exercise rights and deal with others in society." *NRA v. Bondi*, 133 F.4th 1108, 1118 (11th Cir. 2025) (en banc). I believe this fact is likely relevant to establishing how the founding generation understood the rights of underage persons to obtain firearms.

{¶15} But this poses a problem of analogic reasoning: should we take these infancy-related materials as suggesting a tradition of regulating the weapons of those *under 21 years* or of those who were *below the age of legal majority*? The characterization matters, as the overwhelming majority of states today place the age

---

[8] Available at https://archive.org/details/bouvierlawdictionary01/page/501.
[9] Available at https://pennlawreview.com/2025/06/24/common-law-limits-on-firearms-purchases-by-minors-the-original-understanding/.
[10] Available at https://hdl.handle.net/2027/hvd.32044078438215?urlappend=%3Bseq=586.

of majority at 18, not 21. *See* Hamilton, *Adulthood in Law and Culture*, 91 Tul.L.Rev. 55, 56 (2016).[11] Ohio law expressly provides that "[a]ll persons of the age of eighteen years or more, who are under no legal disability, . . . are of full age for all purposes." R.C. 3109.01. Ohioans between the ages of 18 and 20, who would have been deemed "infants" in the 18th and 19th centuries, are today adults with full legal rights.

**{¶16}** To resolve this tension, we must consider what the relevant "principle[] . . . underpin[ning] our regulatory tradition" is. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024). In other words, we must ask whether our tradition is one of regulating the firearm rights of individuals because they are *beneath the age of majority*, or because they are *under 21 years of age*, regardless of the age of majority.

**{¶17}** I would hold that age of majority, not age 21, provides the relevant constitutional line. History suggests that founding-era limitations on firearm rights were imposed not because of any judgment that those under 21 years of age were dangerous with arms, but because those under 21 were under the legal limitations inherent in minority, and under the legal care and protection of a guardian or parent.

**{¶18}** *First*, as discussed, no state prior to the 1880s prohibited infants from possessing guns. While it may have been difficult for founding-era 18-to-20-year-olds to obtain weapons, they were generally permitted to have them if they could get them. This suggests that the line drawn at 21 was not a categorical determination of dangerousness, but an incidental effect of legal minority and restrictions on economic rights.

**{¶19}** *Second*, numerous legal writers in the 18th- and 19th-centuries emphasized that the 21-year threshold for legal majority was not rooted in hard-nosed

---

[11] Available at https://scholarship.law.wm.edu/facpubs/1824.

assessments of danger with firearms. Instead, they acknowledged the somewhat arbitrary product of tradition. Blackstone noted that the age of majority was "merely arbitrary, and *juris positivi* [i.e., of positive law]," fixed "by the constitutions of different kingdoms . . . at different times." 1 Blackstone at 452. New York Chancellor James Kent likewise described the 21-year line more as an arbitrary legal threshold than a concrete determination about maturity. *See* 2 Kent at 171 ("the age of majority . . . has been variously established in different countries, but with us is fixed at the age of twenty-one"). And John Bouvier, author of America's first major legal dictionary, wrote of how the law "fixed" an age of majority that was "uniform as to all," despite the reality that "[t]he age at which man no longer requires aid and advice for his conduct, is not the same in every individual; some being precocious, and others slow at arriving at maturity." 1 Bouvier, *Institutes*, at § 337. In fact, modern legal historians have suggested that the common law shifted the age of majority from 14 or 15 years to 20 or 21 years during the medieval period, not because of shifting conceptions of maturity, but in order to accommodate the "weight of the arms" worn by adult knights. *See* James, *The Age of Majority*, 4 Am.J.Legal Hist. 22, 30 (1960);[12] *see also* Hamilton, 91 Tul.L.Rev. at 63-64.

{¶20}  *Third*, a close examination of the Uniform Militia Act of 1792, Ch. 33, 1 Stat. 271,[13] and accompanying state laws further reinforces that any firearms disabilities experienced by those under 21 were not safety-related, but were legal incidents of infancy. In the Uniform Militia Act, the Second Congress of the United States required "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be *of the age of eighteen years*, and under the

---

[12] Available at https://doi.org/10.2307/844549.
[13] Available at https://www.govinfo.gov/app/details/STATUTE-1/STATUTE-1-Pg271.

age of forty-five years" to "severally and respectively be enrolled in the militia." (Emphasis added.) Act of May 8, 1792, Ch. 33, 1 Stat. 271, § 1.[14] Compulsory enrollment of those under 21 suggests that the Second Congress believed 18-to-20-year-olds could, at least in certain circumstances, be trusted to keep and carry weapons. And this generally meant trusting them to keep those arms *in their homes*, as militia weapons were generally furnished, kept, and maintained by the individual militiamen. *See* Cornell & DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 487, 509-10 (2004);[15] Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, 43 S.Ill.Univ.L.J. 496, 501 (2019)[16] ("American militiamen were expected to keep their own arms at home, and to be proficient with those arms.").

{¶21} Although the government wanted and instructed minors to bear arms in the Uniform Militia Act, the common law doctrine of infancy continued to prevent them from making the contracts necessary to obtain those weapons—a burden felt especially keenly in cash-poor America, where most business relied upon systems of contractual credit. *See* Cornell, 173 U.Penn.L.Rev.Online at 135-136. To remedy this, the majority of states and territories circumvented common-law restrictions, so that, "[b]y 1826, at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population—had enacted laws that placed the onus on parents to provide minors with firearms for militia service." (Citation omitted.) *NRA*, 133 F.4th at 1120; *see also id.* at 1119-1120 (collecting statutes). By contrast, only a few states elected to solve this problem by exempting militia-eligible "infants" from the

---

[14] Available at https://www.govinfo.gov/app/details/STATUTE-1/STATUTE-1-Pg271.
[15] Available at https://ir.lawnet.fordham.edu/flr/vol73/iss2/3.
[16] Available at https://law.siu.edu/_common/documents/law-journal/articles-2019/spring-2019/4-kopel-jr5-3.pdf

requirement of keeping and bearing their own arms. *See id.* at 1119, citing Act of April 11, 1793, Ch. 1696, § 2, in 14 Mitchell & Flanders, *The Statutes at Large of Pennsylvania from 1682 to 1801*, 454, 456 (1909),[17] and Act of June 18, 1793, Ch. 36, § 2 and 4, in 2 *Laws of the State of Delaware*, 1134, 1135-1136 (Samuel & John Adams Eds. 1797).[18]

**{¶22}** In sum, the history suggests that individuals aged 18 to 20 were not deemed too dangerous to bear arms at the founding. They were merely hindered in securing arms by the limitations imposed on their legal and economic autonomy, because of their age and dependence upon their parents or guardians. The Uniform Militia Act showed that the founding generation felt 18-to-20-year-olds *could* be trusted to keep weapons in their homes, if only the State would help them to circumvent common-law difficulties relating to legal minority.

**{¶23}** Any tradition of firearm restrictions based on age and infancy, therefore, should be viewed as tied to the line between minority and majority, not to the line between 20 and 21 years. Minors today, like infants at the founding, are in the custody of a parent and/or guardian. *See* R.C. 2111.06 ("A guardian of the person of a minor shall be appointed as to a minor having no father or mother, whose parents are unsuitable persons to have the custody of the minor . . . , or whose interests, in the opinion of the court, will be promoted by the appointment of a guardian."). Ohio law continues to recognize a parental "duty of care, protection, or support" owed to their minor children. *See* R.C. 2919.22(A) (punishing parents, guardians, and similar figures for certain violations of "duty of care, protection, or support" owed to a "child under eighteen years of age or a child with a mental or physical disability under

---

[17] Available at https://hdl.handle.net/2027/mdp.39015050623514?urlappend=%3Bseq=462.
[18] Available at https://hdl.handle.net/2027/njp.32101042903870?urlappend=%3Bseq=553.

twenty-one years"); R.C. 3103.03(A) ("The biological or adoptive parent of a minor child must support the parent's minor children out of the parent's property or by the parent's labor."); *see also Smith v. Smith*, 2006-Ohio-2419, ¶ 10 ("All parents have a duty to support their minor children.").

**{¶24}** Individuals who, like Reed, are between the ages of 18 and 20, are not minors today. Such individuals enjoy effectively full legal rights and autonomy. They can participate freely in the economic and legal life of the community and have the right to vote. *See* U.S. Const., amend. XIX. Most significantly, the law leaves 18-to-20-year-olds today only themselves to depend upon for aid and protection. As Judge Brasher of the Federal Court of Appeals for the Eleventh Circuit wrote of a similar Florida law:

> Unlike minors, eighteen- to twenty-one-year-olds in Florida today must protect, shelter, and defend themselves. Because they are adults, neither the state nor their parents owe them any special duty of protection or defense. It is one thing for a state to restrict a twenty-year-old's freedom to defend himself when the state also imposes a legal duty of care and protection on the twenty-year-old's parents; it is another thing entirely to prevent a twenty-year-old from acquiring the means to defend himself when there is no one else to defend him.

*NRA*, 133 F.4th at 1185 (Brasher, J., dissenting)

**{¶25}** Simply put: "eighteen- to twenty-one-year-olds . . . today are analogous to adults, not minors, at the time these [founding-era] statutes were enacted." *Id.* Thus, laws restricting the rights of modern 18-to-20-year-olds are not "relevantly similar" to laws or traditions restricting the rights of infants. For this reason, I would reject the State's invitation to hold that our nation's history and tradition empowers

the State to fully disarm 18-to-20-year-olds based solely on their age.

{¶26} Instead, I would uphold Reed's conviction under R.C. 2923.12(C)(2) by applying the logic in *Hall*, 2025-Ohio-1644 (1st Dist.), and affirm on that basis.

{¶27} As we explained in *Hall*, history shows that states could (and can) prohibit all concealed carry, so long as they allowed open carry for personal self-defense. *Id.* at ¶ 79-80. Historically, several states imposed such restrictions upon all their citizens in an effort to reduce the risk of surprise shootings with hidden arms. *See id.* at ¶ 89, 103-105. Thus, states today may impose concealed-carry restrictions on subsets of that group for the same reason, so long as open carry remains available, and the statutory classifications do not offend some other constitutional provision, like the Equal Protection Clause. *Id.* at ¶ 101-103, 108-109. Like *Hall*, Reed has not raised an Equal-Protection challenge. *Id.* at ¶ 109. And because Reed remained free to carry openly, I hold that the age-based application of R.C. 2923.12(C)(2) to Reed falls within our Nation's broader tradition of restricting manner of carry.

{¶28} With these understandings in mind, I concur in the court's opinion and judgment.

**BOCK, J.,** concurring in part and dissenting in part.

{¶29} Reed was 19 years old when he was arrested for possessing a concealed weapon. Had Reed orbited the sun two more times, his conduct would not have been criminal in Ohio. While I concur in the court's determination that Reed's challenge under the Ohio Constitution fails, I dissent because the court rejects Reed's challenge under the Second Amendment to the United States Constitution.

## A. *The State failed to establish a historical tradition of regulating 18-to-20-year-olds' firearm possession*

{¶30} The State concedes that Reed was among the "people" protected under

the Second Amendment and that his conduct—possessing a concealed firearm—falls under the "plain text" of the Amendment. *See State v. Storms*, 2024-Ohio-1954, ¶ 24 (1st Dist.); *see also State v. Barber*, 2025-Ohio-1193, ¶ 33 (1st Dist.). Accordingly, the State bore the burden of justifying Reed's carrying-a-concealed-weapon ("CCW") charge by affirmatively presenting historical evidence to establish that the State's forbidding Reed from carrying a concealed firearm was consistent with this Nation's "historical tradition of firearm regulation." *New York State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1, 24 (2022).

**{¶31}** I agree with the concurring opinion that the State failed to show that this Nation's history of firearms regulation establishes that those under 21 years of age lacked Second Amendment rights. At most, the State has shown that historically, "infants"—those under the age of majority[19]—were subject to their parents' control and therefore lacked the full array of rights that adults enjoyed. But starkly absent from the State's historical evidence is a reference to anything demonstrating that infants were deprived of the right to bear arms.

**{¶32}** The State ably shows that infants could not vote. *See* Walsh and Cornell, *Age Restrictions and the Right to Keep and Bear Arms*, 108 Minn. L. Rev. 3049, 3064 (2024). And infants experienced economic realities that affected others' willingness to enter into contracts with them. *See NRA v. Bondi*, 133 F.4th 1108, 1118 (11th Cir. 2025) (collecting authorities). Considering the relative ease with which the State established these historical traditions, one would think that if a historical tradition existed in which infants were deprived of the right to bear arms, the State would offer some affirmative indication that this was so. But the State has failed to show that this was

---

[19] At the founding, states usually chose 21 as the age of majority.

the case.

**{¶33}** Instead, 18-year-olds—legal infants at the time of the founding—were expected to bear arms and serve in the militia. *See* Act of May 8, 1792, Ch. 33, 1 Stat. 271, § 1. It is true that some states required an infant's parents to provide the infant with firearms. But that fact does not support the conclusion that infants affirmatively lacked the right to bear arms. Instead, a parent's obligation to arm their militia-bound infants suggests that, because infants generally lived under the control of their parents and lacked the capacity to contract, infants were unlikely to have the necessary cash to purchase a weapon.

**{¶34}** So from the get-go, the State's evidence offered to demonstrate a historical tradition of regulating infants' right to bear arms is lacking. That evidence is not the type of historical support that the United States Supreme Court requires the State to provide under *Bruen*.

**{¶35}** But even if one accepts that we can infer that infants had no rights, or reduced rights, to bear arms, the State still needs to connect that tradition to its prosecution of Reed. And simply put, Reed is not an infant. *See* R.C. 3109.01. Instead, he is an adult, entitled to no care, support, or consideration of any kind from his parents. No person on Earth stands obligated to do anything for Reed. He is expected to secure his own food, buy his own clothes, put a roof over his head, and fulfill all of his obligations on his own. Reed possesses the rights guaranteed under every other amendment in the Bill of Rights. Why would the Second Amendment rights afforded to every adult 21 and older not extend to him?

**{¶36}** The State can only get to its desired outcome if the Second Amendment is tied not to the age of majority, but to the age of 21. But the State's offered historical tradition tells us, at most, that legal infancy was the status permitting a restriction on

the infant's rights and that 21 years was the age on which the founding-era legislatures happened to settle at the time.

{¶37} The State's strongest argument is that infants lacked civil rights, not because they were under the care of their parents, but because they were viewed as too immature to be trusted to wield those rights. Accordingly, these immature infants were placed under the care of their parents, who exercised the rights on the infant's behalf until they became mature. If that is the case, then it was immaturity that drove the deprivation of infants' rights, and immaturity that resulted in infants being under the control of their parents. In other words, infants were not immature because they were in the custody of their parents; rather, they were in the custody of the parents because they were immature.

{¶38} From that, we could gather that the "why" behind this historical tradition of regulating the rights of infants was due to immaturity. If that were the case, Ohio's CCW law seems a good fit. It too—presumably—restricts the ability of 18-to-20-year-olds from carrying concealed weapons because 18-to-20-year-olds lack the maturity to responsibly do so.

{¶39} The problem with this argument is that *Bruen* did not ask us to analogize from some general historical tradition. Instead, the Supreme Court in *Bruen* demanded evidence of this Nation's "historical tradition of *firearm* regulation." (Emphasis added.) *Bruen*, 597 U.S. at 24; *see Bondi*, 133 F.4th at 1165 (Brasher, J., dissenting) ("The Supreme Court has not instructed us to consider an untethered 'historical tradition'—the tradition must be of firearm regulation."). This is why I cannot agree that the State has carried its burden. While there may be a tradition of restricting some infants' rights at the time of the founding, absent from that tradition is any *firearm*-based restriction. However wise it may be to regulate the use of guns

16

by those under 21 years old—and in my mind, such regulations certainly seem wise—*Bruen* is the law and demands a historical tradition of *firearm* regulation. Without that, the State cannot carry its burden.

### B. Ohio's CCW regulatory scheme restricts concealed carry for dissimilar reasons to those at the time of the founding

**{¶40}** Even though the State has failed to establish the existence of a historical tradition of restricting the firearm access of those 18 to 21 years of age, the State could still carry its burden by showing that Reed's CCW charge was otherwise compatible with a historical firearm tradition. The concurring opinion concludes that the State has done so based on this court's decision in *State v. Hall*, 2025-Ohio-1644 (1st Dist.), where the court held that states may prohibit all concealed carry if open carry is not prohibited. *Id.* at ¶ 79-80. But as explained in *Barber*, 2025-Ohio-1193 (1st Dist.), it is not enough under *Bruen*'s test to show that the manner in which the State has restricted a person's Second Amendment right is similar to a historical tradition. The reason behind the modern law must be similarly analogous.

**{¶41}** There is no getting around that the State must show that modern firearm regulations regulate firearms "for similar reasons" as founding-era regulations did. *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (explaining that in evaluating *Bruen*'s "how and why" metric, "contemporary laws imposing similar restrictions for similar reasons" will pass constitutional muster); s*ee also Bruen*, 597 U.S. at 29 ("While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").

**{¶42}** Because *Bruen* required a modern law to be relevantly similar to the

Nation's historical tradition in both *how and why* it restricts the right to bear arms, if modern day laws do not regulate firearms for relevantly similar reasons, those laws are unconstitutional under *Bruen* and *Rahimi*.

**{¶43}** And it is the State's burden to affirmatively establish the "why" behind the modern regulation and that this modern "why" is rooted in the Nation's historical tradition of firearms regulation. Here, the State failed to articulate the "why" behind the modern law being challenged. That leaves us in a difficult position as we are left to unilaterally divine the purpose of a challenged law.

**{¶44}** As we explained in *Barber*, by permitting most Ohioans to carry concealed weapons with no training and no permit, Ohio has made the unequivocal judgment that carrying a concealed weapon is not, in itself, a dangerous act. *See Barber*, 2025-Ohio-1193, at ¶ 55 (1st Dist.). Instead, Ohio has indicated that it believes responsible adults have a constitutional right to carry a concealed firearm.[20] And Ohio only removes that right when a person (1) has engaged in conduct suggesting they are dangerous, such as being convicted of a felony, *see* R.C. 2923.111(A)(2)(b) and (c), or (2) possesses some characteristic whereby their specific act of carrying a concealed weapon is dangerous (such as being an adult younger than 21 years old, *see* R.C. 2923.111(A)(2)(a)).

**{¶45}** The *Hall* court concluded that Ohio continues to regulate concealed

---

[20] Any suggestion that a person's ability to carry a concealed weapon does not implicate their constitutional rights under the Second Amendment is contrary to public statements made by proponents of 2022 S.B. 215, which enacted R.C. 2923.111. Senator Johnson, the bill's sponsor, specifically cited both the Second Amendment and the Ohio Constitution when testifying in support of the bill. *See* Senator Johnson, *Sponsor Testimony before the Ohio House Government Oversight Committee*, https://www.legislature.ohio.gov/legislation/134/sb215/committee (accessed Sept. 12, 2025). And its other proponents repeatedly refer to R.C. 2923.111 as enshrining "constitutional carry" in Ohio. *See* John Weber, *Testimony before the Ohio Veterans and Public Safety Committee*, https://www.legislature.ohio.gov/legislation/134/sb215/committee (accessed Sept. 17, 2025).

carry for relevantly similar reasons as antebellum[21] states did: "to reduce individuals' ability to ambush or surprise those around by attacks with hidden weapons." *Hall*, 2025-Ohio-1644, at ¶ 82 (1st Dist.). But in my opinion, that is an incomplete explanation for why Ohio regulates the right to carry concealed weapons. Ohio does not regulate the right to carry a concealed gun because it views doing so as dangerous; rather, it regulates *specific people*'s right to carry a concealed weapon based on the State's belief that certain people are more dangerous than other people and therefore are not safe to carry a concealed weapon. So, an individual's specific characteristic is the factor causing Ohio to restrict their right to bear arms.

{¶46} In Reed's case, the specific characteristic Ohio uses as the "why" behind its burdening his right to bear arms is his being under the age of 21. And as explained above, there is no historical support to restrict a person's right to bear arms based on a person being a legal adult under the age of 21. And similarly to *Barber*, there is no basis to determine that Reed's being 20 years old establishes that he is the kind of "dangerous" person that may be permissibly disarmed under the Second Amendment. *See Barber* at ¶ 60.

{¶47} Finally, as discussed above, *Bruen* prohibits states from imposing modern regulations on people's gun rights unless such regulation both imposes a comparable burden and imposes it for reasons comparable to historical tradition. As such, when a state's statutory scheme burdens some people's rights to bear arms, while not burdening others, a challenged law must be relevantly similar to historically-

---

[21] The historical concealed-carry laws upon which the State and *Hall* relied all postdate the founding by several decades and did not become prevalent until the antebellum era. *See Barber*, 2025-Ohio-1193, ¶ 41 (1st Dist.), quoting *United States v. Tolmosoff*, 2024 U.S. Dist. LEXIS 66920, *20 (E.D.Cal. Apr. 11, 2024) ("'Historians appear to agree that licensing schemes were a post-Civil War phenomenon, largely due to the development of urban centers, professional police forces, and administrative agencies.'").

permissible firearm regulations. Contrary to the *Hall* court's assertion that "Ohio's decision to grant a statutory right to others cannot expand Hall's constitutional right to bear arms under the Second Amendment," *Hall*, 2025-Ohio-1644, at ¶ 108 (1st Dist.), the State's allowing only some people to carry concealed firearms may infringe on Second Amendment rights where, as here, the reason for the firearm regulation is not similar to historical reasons for regulating firearms. In constitutional areas beyond the Equal Protection Clause, laws restricting conduct that the State could completely prohibit may still be unconstitutional if the law adds some additional element that reveals an impermissible purpose. *R. A. V. v. St. Paul*, 505 U.S. 377, 384 (1992) ("the government may proscribe libel; but it may not make the further content discrimination of proscribing only libel critical of the government."). So the fact that the State regulates one method of bearing arms—carrying concealed firearms—that it might be permitted to ban outright does not mean that the regulation is permissible when the regulation is imposed for reasons that are dissimilar to the reasons for historical total bans.

{¶48} I would therefore hold that the State failed to carry its burden to demonstrate that the State's regulation of Reed's right to bear arms comports with the "historical tradition of firearm regulation," sustain the assignment of error, and reverse Reed's conviction. Because the court does not do so, I respectfully dissent.