[Cite as *State v. Stonewall*, 2025-Ohio-4974.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                    :        APPEAL NO.    C-240607
                                           TRIAL NO.     B-2305701-A
    Plaintiff-Appellee,      :

vs.                              :

ADDISON STONEWALL,               :            *JUDGMENT ENTRY*

    Defendant-Appellant.     :


This cause was heard upon the appeal, the record, the briefs, and the arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 10/31/2025 per order of the court.**


**By:**_____
          **Administrative Judge**

[Cite as *State v. Stonewall*, 2025-Ohio-4974.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240607 |
| | | TRIAL NO. B-2305701-A |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N* |
| ADDISON STONEWALL, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 31, 2025

*Connie Pillich*, Hamilton County Prosecuting Attorney, *Scott M. Heenan* and *Norbert Wessels*, Assistant Prosecuting Attorneys, for Plaintiff-Appellee,

*Kessler Defense, LLC,* and *Stephanie Kessler*, for Defendant-Appellant.

**ZAYAS, Judge.**

**{¶1}** Addison Stonewall appeals his convictions, after no-contest pleas, for carrying a concealed weapon ("CCW") and improper handling of firearms in a motor vehicle. In two related assignments of error, Stonewall argues that the trial court erred by denying his motion to dismiss the charges because the statutes unconstitutionally infringe upon his right to bear arms. For the following reasons, we affirm the judgment of the trial court. While we profoundly understand the impact of gun violence on our communities, it is our duty to address the constitutionality of the challenged statutes within the confines of Stonewall's arguments.

## Factual Background

**{¶2}** On November 29, 2023, Stonewall was indicted for CCW and improper handling of firearms in a motor vehicle. Stonewall filed a motion to dismiss the indictment arguing that the statutes prohibiting the carrying of a concealed weapon and regulating the transportation of a loaded firearm in a motor vehicle unconstitutionally violated his right to bear arms.

**{¶3}** Stonewall was charged with violating R.C. 2923.12(A)(2) for carrying a concealed firearm in a vehicle and R.C. 2923.16(B) for having a loaded firearm in a car that was accessible to him without leaving the vehicle. Both statutes exempt persons with a concealed handgun license from criminal liability. *See* R.C. 2923.12(C)(2) (stating R.C. 2923.12(A)(2) does not apply to a person who has a valid concealed handgun license); R.C. 2923.16(F)(5)(a) (stating that R.C. 2923.16(B) does not apply if the person transporting the firearm has a valid concealed handgun license).

**{¶4}** Effective June 13, 2022, R.C. 2923.111 allows a "qualifying adult" to carry a concealed handgun without a license, including in a motor vehicle. *See* R.C. 2923.111(B) and (C); R.C. 2923.16(F)(5). A "qualifying adult" is a person who is 21

years of age or older, not legally prohibited from possessing a firearm under 18 U.S.C. 922(g)(1) to (9) or R.C. 2923.13 (having weapons while under disability), and satisfies all the criteria in divisions (D)(1)(a)-(j), (m), (p), (q), and (s) of R.C. 2923.125, the statute governing the application for a concealed handgun license. R.C. 2923.111(A)(2).

{¶5} At the time of the indictment, Stonewall was 19 years old. He was a high school graduate who was gainfully employed. He had no felony record, and his record consisted of two misdemeanors for criminal trespass and disorderly conduct.

{¶6} Both parties agreed that Stonewall is ineligible to carry a concealed handgun under R.C. 2923.111 or obtain a concealed handgun license under R.C. 2923.125 because he is not considered a qualifying adult until he attains 21 years of age. Stonewall filed a motion to dismiss both charges, alleging that R.C. 2923.12(A)(2) and 2923.16 were unconstitutional, as applied to him, because they prohibited him from carrying a concealed weapon in violation of his right to bear arms.

{¶7} The State filed a response, conceding that the conduct regulated by both statutes is covered by the plain text of the Second Amendment. The State cited to a historical tradition of treating those under the age of 21 as "infants" whose rights were limited due to their lack of rationality and moral responsibility. The State also noted that Stonewall has the right to own, possess, and openly carry a firearm, and the challenged statutes merely regulate the manner in which he may exercise his right to bear arms. The trial court overruled the motion.

{¶8} Stonewall now appeals, and in two assignments of error, he contends that the trial court erred by denying Stonewall's motion to dismiss the CCW and improper-handling charges.

## Second Amendment

**{¶9}** An appellate court reviews the trial court's denial of a motion to dismiss de novo. *See State v. Thacker*, 2024-Ohio-4585, ¶ 7 (1st Dist.).

**{¶10}** The Second Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). In *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment provides an individual with the right to possess and carry firearms for "lawful purposes," such as self-defense. *Id.* at 576-626.

**{¶11}** More recently, in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court held that New York's public-carry licensing scheme, which required an applicant to demonstrate a special need for self-defense, violated the Second Amendment. *Id.* at 14. In reaching this conclusion, the Court reiterated that the Second Amendment guarantees an individual a right to carry a handgun in public for self-defense. *Id.* at 10.

**{¶12}** The *Bruen* Court clarified the two-part test that courts must apply to determine whether a statute violates the Second Amendment. *Id.* at 8-22. Under the first prong, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. Then, if it is determined that the plain text covers an individual's conduct, the burden shifts to the government to justify its regulation by demonstrating that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

**{¶13}** The State agreed that the Second Amendment covers the conduct regulated by the statutes governing Stonewall. Accordingly, we begin our analysis at

step two.

**{¶14}** Here, the burden shifts to the State to establish that "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen,* 597 U.S. at 17, quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50, fn.10 (1961).

**{¶15}** "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi* at 692, citing *Bruen* at 29. The court identified two metrics to inform the analogical inquiry: how and why the regulation burdens the right to bear arms. *Rahimi* at 692. If it addresses the same problem as historical restrictions, it shares a "why" with those restrictions. *Id.* A shared "why" is a "strong indicator" that a modern regulation "fall[s] within a permissible category of regulations." *Id.* "For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* A statute is lawful if it "fits within" and "is consistent with the principles that underpin" that tradition. *Id.*

**{¶16}** "Rather than asking whether a present-day gun regulation has a precise historical analogue, courts applying *Bruen* should 'conside[r] whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.'" *Id.* at 703-704 (Sotomayor, J. concurring). Analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. *Id.* at 701, citing *Bruen* at 30. We must be mindful that "[o]ur tradition

of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id*. at 700. "Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Id*. at 690.

{¶17} The dissent contends that the State "offered no valid justification" for the restriction and concludes that "the lack of a current rationale for the challenged statutes to be fatal to their constitutionality in this case." Yet, in his brief to this court, Stonewall himself acknowledged that "the impetuousness and rashness of young adults" has been a societal problem since the founding and that the Nation has a tradition of disarming those determined to be dangerous. Significantly, the argument that the State failed to offer any justification for the regulations appears for the first time in the dissent but was not raised by Stonewall. Instead, Stonewall argued that "the State has not identified a historical firearm regulation prohibiting people aged 18-20 from carrying firearms within reach while traveling." Stonewall erroneously interprets *Bruen* to require a "historical twin." However, as *Rahimi* reiterated, "a 'historical twin' is not required." *Rahimi* 62 U.S. at 701.

{¶18} The dissent further concludes that "the underinclusivity of Ohio's regulations undercuts its asserted rationale." This type of "means-end scrutiny" was abandoned in *Bruen*. *Id*. at 706. *Bruen* makes it clear that such interest-balancing, whether strict or intermediate scrutiny, has no place in the Second Amendment analysis. *State v. Hall*, 2025-Ohio-1644, ¶ 107 (1st Dist.). Rather, "[t]he Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." (Emphasis in original.) *Bruen*, 597 U.S. at 26, citing *Heller*, 554 U.S. at 635. "It is this balance — struck by the traditions of the American people

7

— that demands our unqualified deference." *Bruen* at 26.

**{¶19}** More importantly, the dissent relies on the analysis in *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024), an Eighth Circuit case, and appears persuaded by it after "glean[ing] that the *Worth* court properly scrutinized Minnesota's current legislative rationale" because the Supreme Court declined certiorari review. This is contrary to the Supreme Court's own directive that "a denial of certiorari does not mean that the Court agrees with a lower-court decision." *Snope v. Brown*, 145 S.Ct. 1534, 1535 (2025) (Kavanaugh, J., statement respecting the denial of certiorari); *see also Boston Parent Coalition For Academic Excellence Corp. v. Boston School Commt.*, 145 S.Ct. 15, 15 (2024) (Gorsuch, J., statement respecting the denial of certiorari) (Citation omitted.) ("Our decision today, however, should not be misconstrued. A denial of certiorari does not signify that the Court necessarily agrees with the decision (much less the opinion) below.").

**{¶20}** "[T]he State's rationale for giving some persons concealed-carry rights and not others is constitutionally irrelevant. In our view such concerns—including the under-inclusiveness concerns voiced by the [dissent]—raise Equal Protection questions, not Second Amendment ones." *Hall* at ¶ 106. Moreover, *Rahimi* rejected this "rigid approach" because it results in "disqualify[ing] virtually any 'representative historical analogue' and mak[ing] it nearly impossible to sustain common-sense regulations necessary to our Nation's safety and security." *Rahimi* 602 U.S. at 705.

### A. Carrying a Concealed Weapon

**{¶21}** Stonewall contends that the trial court erred by denying his motion to dismiss the CCW charge because the State failed to demonstrate that the statute is consistent with the Nation's historical tradition of disarming those like Stonewall.

**{¶22}** The *Bruen* Court discussed the constitutionality of laws prohibiting the

concealed carry of firearms mentioned in *Heller*. *Bruen*, 597 U.S. at 52. "In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons." *Id.* Notably, "the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.*, citing *Heller,* 554 U.S. at 626.

{¶23} History reveals that concealed-carry prohibitions were constitutional provided they did not similarly prohibit open carry. *See State v. Reid*, 1 Ala. 612, 616, 619-621 (1840) (holding that the statute merely regulated the "the manner in which arms shall be borne" and did not "inhibit the citizen from bearing arms openly" and noting that there was no evidence "tending to show that the defendant could not have defended himself as successfully, by carrying the pistol openly, as by secreting it about his person."); *State v. Chandler*, 5 La. Ann. 489, 490 (1850) (Louisiana law criminalizing carrying a concealed weapon "interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality"); *Nunn v. State*, 1 Ga. 243 (1846) (Georgia's law prohibiting concealed carry was deemed constitutional, but to the extent the law also prohibited "bearing arms openly," that part of the statute was unconstitutional.); *State v. Jumel*, 13 La. Ann. 399 (1858) (The statute barring carrying concealed weapons "does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society."). Both Indiana and Arkansas determined that concealed-carry prohibitions were constitutional. *Bruen* at 53, fn. 20. New Mexico's Constitution provides that "[t]he people have the right to bear arms for their security and defense, but nothing herein shall be held to permit the carrying of concealed weapons." N.M. Const., art. II, §6 (1911).

**{¶24}** Thus, historically states have prohibited the carrying of concealed firearms, and courts have upheld those laws as constitutional provided they did not similarly prohibit open carry. *Bruen* at 52-55. When a challenged regulation fits within our "historical tradition of firearm regulation," it is lawful under the Second Amendment. *Rahimi*, 602 U.S. at 691. "[T]he purpose behind our nation's history of CCW laws was to reduce the risk of surprise attacks from hidden weapons, while leaving untouched the right to carry openly for self-defense." *Hall*, 2025-Ohio-1644, at ¶ 57 (1st Dist.). Thus, the regulation prohibiting carrying a concealed weapon fits within our historical tradition and is constitutional. *See id.* at ¶ 79.

**{¶25}** Moreover, Stonewall may own, possess, purchase, and publicly carry a firearm. Stonewall is permitted to open-carry a firearm in public for self-defense purposes. As the *Bruen* Court reiterated, the Second and Fourteenth Amendments protect the "right to carry a handgun for self-defense outside the home." *Bruen* 597 U.S. at 10. Accordingly, prohibiting Stonewall from carrying a concealed weapon until he turns 21 does not prevent him from exercising his Second Amendment right to carry a handgun in public.

**{¶26}** We overrule the first assignment of error.

## B. Improper Handling

**{¶27}** In his second assignment of error, Stonewall argues that the trial court erred by denying Stonewall's motion to dismiss the improper-handling charge. Stonewall contends that R.C. 2923.16(B) violates his right to bear arms by prohibiting him from carrying a loaded handgun in a motor vehicle for defensive purposes. R.C. 2923.16(B) provides that "[n]o person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." Exempted from this provision

are persons who are qualifying adults. Until Stonewall reaches the age of 21, he is ineligible for the status of a qualifying adult. We note that this regulation also does not implicate Stonewall's ability to purchase a firearm, nor his ability to otherwise possess or use a firearm.

{¶28} "The founding 'generation shared the view that minors lacked the reason and judgment necessary to be trusted with legal rights[,]' and that, accordingly, 'infants were subject to the "'power'" of their parents until they reached age 21.'" *Commonwealth v. Williams*, 2025 Pa.Super. LEXIS 284, *17-18 (Pa.Super., July 1, 2025), citing *Natl. Rifle Assn. v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025), citing 1 William Blackstone, *Commentaries on the Laws of England*, at 452-53 (1871). As the State pointed out, historically, the term "infant" applied to persons under 21. *See* 1 William Blackstone, *Commentaries on the Laws of England* 451 (Oxford, Clarendon Press 1765) ("So that full age in male or female, is twenty one years ... who till that time is an infant, and so styled in law."); *Black's Law Dictionary* (9th Ed. 2009) ("An infant in the eyes of the law is a person under the age of twenty-one years," quoting John Indermaur, *Principles of the Common Law* 195 (Edmund H. Bennett, 1st Am. Ed. 1878)).

{¶29} Blackstone further explained that parents had the power to limit their children's rights of association, to control their estates during infancy, to profit from their labor, to prohibit marrying without parental consent, and to limit their right to contract. *Id.* at 452-53, 457, 465. At the time of the founding, minors lacked the right to enter into contracts or sue without joining their guardian. *See Lara v. Commr. Pennsylvania State Police*, 125 F.4th 428, 449 (Restrepo, J., dissenting). When founding-era youths went off to college, universities, standing in loco parentis, often prohibited students from carrying firearms both on and off campus. *See id.* at 450-51

(discussing founding-era weapons bans at Yale University, University of Georgia, University of North Carolina, and University of Virginia).

{¶30} By the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use firearms. *See, e.g., State v. Quail*, 92 A. 859, 859 (Del. 1914) (discussing indictment for "knowingly sell[ing] a deadly weapon to a minor other than an ordinary pocket knife"); *State v. Allen*, 94 Ind. 441 (1884) (discussing prosecution for "unlawfully barter[ing] and trad[ing] to Wesley Powles, who was then and there a minor under the age of twenty-one years, a certain deadly and dangerous weapon, to wit: a pistol, commonly called a revolver, which could be worn or carried concealed about the person"); *Tankersly v. Commonwealth*, 9 S.W. 702, 702 (Ky. 1888) (discussing indictment for selling a deadly weapon to a minor); *United States v. Rene E.*, 583 F.3d 8, 14 (1st Cir. 2009) ("During this period and soon after, a number of states enacted similar statutes prohibiting the transfer of deadly weapons—often expressly handguns—to juveniles.").

{¶31} Several courts have addressed laws that prohibit the purchase or possession of firearms by minors. In *Rene E.*, the First Circuit found the federal ban on juvenile possession of handguns to be constitutional because the law contained exceptions for "juveniles to possess handguns for legitimate purposes, including hunting and national guard duty, as well as 'in defense of the juvenile or other persons against an intruder into the residence of the juvenile or a residence in which the juvenile is an invited guest.'" *Rene E.* at 8, 15.

{¶32} In reaching this conclusion, the court reviewed the historical laws and the above cases regulating a juvenile's access to and possession of firearms. The court noted that in *Biffer v. City of Chicago*, 116 N.E. 182, 184-85 (1917), "the Supreme Court

of Illinois held that a Chicago ordinance that required individuals to obtain a permit to purchase concealable weapons, including handguns, and denied such permits to 'all minors,' did not violate either the Illinois or the United States Constitution." *See also State v. Callicutt*, 69 Tenn. 714 (1878) ("[W]e do not deem it necessary to do more than say that we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions."). The court acknowledged that the regulations "sometimes reflected concerns that juveniles lacked the judgment necessary to safely possess deadly weapons, and that juvenile access to such weapons would increase crime." *Rene E.* at 15-16. The court concluded "the founding generation would have shared the view that public-safety-based limitations of juvenile possession of firearms were consistent with the right to keep and bear arms." *Id.* at 15. Ultimately, the court held that "this law, with its narrow scope and its exceptions, does not offend the Second Amendment." *Id.* at 23; *see also Jones v. Bonta*, 2023 U.S. Dist. LEXIS 219150, at *22 (S.D. Cal. Dec. 8, 2023) (finding there is no "historical evidence that American males [under the age of majority] were trusted with firearms without proper supervision and training, or that they had unfettered rights to keep, bear, and acquire them.").

{¶33} Courts have held that restricting firearms to minors "fits comfortably" within the "American tradition of burdening the ability of 18- to 20-year-olds to purchase goods, including firearms." *McCoy v. BATFE*, 140 F.4th 568, 577 (4th Cir. June 18, 2025). "This understanding of the legal status of minors at the founding and the restrictions on bearing arms to which they were subject lends itself to the conclusion that our nation has a historical tradition of restricting the rights of those aged 18 to 20." *Williams*, 2025 Pa.Super. LEXIS 284, at *18.

13

**{¶34}** *Williams* analyzed a state statute that prohibited carrying a concealed weapon in a vehicle without a license. 18 Pa.C.S.A. § 6106(A)(1). Similar to Ohio's law, individuals under 21 were ineligible to obtain a license. 18 Pa.C.S.A. § 6109. Williams argued that the statute violated his Second Amendment rights because "carrying a firearm in a vehicle—was akin to carrying a gun for self-defense outside the home." *Id.* at *8.

**{¶35}** First, the court noted that "our nation's state legislatures have categorically disarmed groups judged too dangerous to be able to safely or responsibly bear arms." *Id.* at *16. In the 19th century, "[a]t least 29 jurisdictions limited the sale of firearms to, or the possession of firearms by, individuals below a set age." *Id.* at *17. Additionally, "[t]he founding-era treatment of 18-to-20-year-olds as minors is likewise weighty evidence of a historical tradition. The founding 'generation shared the view that minors lacked the reason and judgment necessary to be trusted with legal rights.'" *Id.*, citing *Lara*, 125 F.4th at 449. The court determined that "[t]his understanding of the legal status of minors at the founding and the restrictions on bearing arms to which they were subject lends itself to the conclusion that our nation has a historical tradition of restricting the rights of those aged 18 to 20." *Id.* at *18.

**{¶36}** When considering the Second Militia Act, which obligated males to enroll in the militia at age 18, the court noted that "states enacted laws to address minors' inability to procure the required firearms for their service." *Williams,* 2025 Pa.Super. LEXIS 284, at *20. "These laws took various forms: Pennsylvania and Delaware exempted minors entirely from the requirement to provide their own firearms; seven states required parents to acquire firearms for their sons' militia service; and twelve states made parents legally liable if their minor children did not appear for service with the requisite firearms." *Id.*, citing *Bondi*, 133 F.4th at 1119-20

(listing statutes). "By 1826, at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population—had enacted laws that placed the onus on parents to provide minors with firearms for militia service." *Id.* at *21, citing *Bondi* at 1120.

{¶37} The court ultimately concluded,

Based upon this history of both common law and statutory restrictions on access to firearms by minors, among other groups, from the pre-founding era through the latter half of the 19th-century, we find that a national historical tradition exists of restricting firearm access to individuals deemed unable to responsibly bear arms, particularly 18-to-20-year-olds. The "how" and "why" of these laws and section 6109 are likewise analogous. The restrictions burden the right to access and possess firearms (the "how") because the defined group—here, 18-to-20-year-olds—has been judged too dangerous to allow such access (the "why"). Therefore, it follows that section 6109 is constitutional under the standard set out in *Bruen*.

*Id.* at *21-22.

{¶38} Restricting a minor's access to a loaded gun in a vehicle is "relevantly similar" to the many "public-carry restrictions [which] proliferate[d]" after the ratification of the Second Amendment in 1791. *Id.* at *24, citing *Bruen*, 597 U.S. at 50. As the *Williams* court explained,

Carrying a weapon concealed on one's person versus storing it in the glovebox or center console is, to this Court, a distinction without a difference. If anything, the additional number of spaces in which to store a firearm within a vehicle, the variety of firearms that can be

carried within a vehicle as opposed to concealed on one's person, and the portability provided by modern vehicles all weigh in favor of [the statute] applying with greater force to possession within a vehicle than possession on one's person.

*Id.* at *24-25.

**{¶39}** Ohio's statute regulates the manner in which a person under 21 may carry a firearm in a motor vehicle. Stonewall may transport an unloaded firearm in his vehicle in "a closed package, box, or case," "in a compartment that can be reached only by leaving the vehicle," or "in plain sight and secured in a rack or holder made for the purpose." R.C. 2923.16(C)(1), (2), and (3). The statute does not deprive him of the "right to carry a handgun for self-defense outside the home." *Bruen* at 10. "*Bruen* does not stand for the proposition that the Second Amendment affords individuals the unfettered right to carry an unregistered firearm while in a vehicle." *State v. Quintile*, 2024-Ohio-2026, ¶ 26 (9th Dist.).

**{¶40}** We overrule the second assignment of error.

## Conclusion

**{¶41}** Having overruled Stonewall's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**NESTOR, J.,** concurs.
**KINSLEY, P.J.,** dissents.

**KINSLEY, P.J.,** dissenting.

**{¶42}** Solely by virtue of his age and nothing else, the State of Ohio has determined that Addison Stonewall may openly possess a loaded firearm in public, but may not conceal a gun on his person, nor may he transport a loaded firearm in the

16

passenger compartment of a vehicle. The State concedes these restrictions burden Stonewall's Second Amendment right to keep and bear arms. But it has offered no valid justification for why it imposes them. That deficiency in the State's argument complicates our ability to locate a historical analogue for Ohio's modern-day regulations, as required by *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1, 17 (2022). I therefore respectfully depart from my colleagues because I find the lack of a current rationale for the challenged statutes to be fatal to their constitutionality in this case.

{¶43} In the wake of *Bruen*, courts across the country have struggled to determine whether and to what extent government may restrict the Second Amendment rights of young adults. In the federal context, appellate courts reviewing state laws like Ohio's have reached seemingly contradictory conclusions about just how far a state may go to limit young people from accessing, possessing, and using guns. For example, in *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024), the Eighth Circuit declared unconstitutional a Minnesota law that prohibits 18-to-20-year-olds from obtaining permits to publicly carry firearms. Similarly, in *Lara v. Commr. Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025), the Third Circuit struck down Pennsylvania's scheme banning 18-to-20-year-olds from carrying a firearm outside the home during an emergency. Parting ways with these authorities, however, the Eleventh Circuit in *Natl. Rifle Assn. v. Bondi*, 133 F.4th 1108 (11th Cir. 2025), upheld Florida's ban on the purchase of firearms by young adults.

{¶44} Earlier this year, without explanation, the United States Supreme Court declined to resolve this seeming split in authority, denying a certiorari petition in the Eighth Circuit case. *See Jacobson v. Worth*, 145 S.Ct. 1924 (2025). Not a single justice voted in favor of reviewing the topic, despite the lower courts' conflicting views of

17

young adults' Second Amendment rights. *Id.* For now, this action by the Supreme Court leaves in place a patchwork of appellate authority that state regulators, lower courts, and ordinary citizens might find confusing.[1]

**{¶45}** The landscape with regard to federal regulations of young adults' firearm access is no less muddled. In *Reese v. Bureau of Alcohol*, 127 F.4th 583 (5th Cir. 2025), for example, the Fifth Circuit struck down a federal ban on selling firearms to 18-to-20-year-olds as being inconsistent with the Nation's historic tradition of firearm regulation. The federal government did not petition the Supreme Court for certiorari review, despite the fact that the court of appeals in *Reese* declared a federal law unconstitutional.[2] But in *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568 (4th Cir. 2025), the Fourth Circuit upheld the exact same provision the *Reese* court invalidated. The federal circuits are therefore directly in conflict as to whether the federal government can constitutionally prohibit the sale of guns to young adults. A petition for writ of certiorari to resolve this conflict remains pending before the Supreme Court in *McCoy*. *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, Sup. Ct. No. 25-24 (July 3, 2025).

**{¶46}** As typified by the federal courts' experience, reasonable jurists can and do disagree as to the proper application of *Bruen* to restrictions on young adults' purchase, possession, and usage of firearms. My colleagues in the majority have set forth one reasonable approach to those questions as they apply to Stonewall in this appeal. I nonetheless write separately because I believe there are other reasonable

---

[1] As I mention later, the Supreme Court's decision denying certiorari in *Worth* is also a clue that that decision was rightfully decided, both in terms of its outcome and in terms of its analogical reasoning.

[2] The Department of Justice's decision to leave intact the Fifth Circuit's decision in *Reese* could be interpreted to suggest the federal government's agreement with its determination that restricting firearms purchases by 18-to-20-year-olds is unconstitutional.

approaches that merit careful consideration, particularly on the litigated record before us and with regard to Ohio's idiosyncratic approach to young adults' possession of guns.

## I. The *Bruen* Test

**{¶47}** As the majority adeptly describes, *Bruen* fashions a two-step test for governmental restrictions on the right to keep and bear arms. *Bruen*, 597 U.S. at 17. The first step of the inquiry is to determine whether the plain text of the Second Amendment covers "an individual's conduct." *Id.* If it does, the conduct is presumptively protected by the constitutional provision. *Id.*

**{¶48}** Where the firearms-related conduct at issue is in fact presumptively protected, the second step under *Bruen* is to inquire whether the restriction is consistent with the Nation's historic tradition of firearm regulation. *Id.* at 17. The burden of meeting this standard falls on the government. *Id.* It may fulfill its burden by presenting relevantly similar founding-era laws to demonstrate that history and the present are in regulatory lockstep. *Id.* at 28-29. In assessing whether a historical analogue fulfills this role, the government need only "identify a well-established historical analogue, not a historical twin." (Cleaned up.). *Id.* at 30.

**{¶49}** Two metrics are particularly relevant to the analogical analysis *Bruen* requires. *Bruen* at 29. First, the modern and historical firearms restrictions should impose comparable burdens on Second Amendment rights. *Id.* at 29. In this regard, a modern law may not be compatible with the historic tradition of firearm regulation if it goes "beyond what was done at the founding." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Next, the modern and historic regulations should be comparably justified, meaning that they share a common legislative rationale. *Bruen* at 29. As the Supreme Court observed in *Rahimi*, "if laws at the founding regulated firearm use to

address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions *for similar reasons* fall within a permissible category of regulations." (Emphasis added.) *Id.* at 692. The appropriate analysis will therefore assess whether "the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." (Emphasis added.) *Id.*

{¶50} *Bruen* analysis is therefore, at its core, a comparative endeavor. It compares the current "how and why" against the historic "how and why" to determine whether the government's modern firearms restrictions comport with the Nation's tradition of Second Amendment regulation. *Bruen*, 597 U.S. at 29.

## II.    The State's Burden under *Bruen*

{¶51} Applying these standards to Stonewall, the initial inquiry at step one is whether Stonewall's conduct—carrying a loaded gun in the passenger compartment of a car—falls within the scope of the Second Amendment's plain text. This is an easy question to answer in this case, because the State concedes that its firearm regulations impact conduct that is presumptively protected by the Second Amendment.[3] But even had the State not conceded the point, it is clear that Stonewall's conduct involved the right to keep and bear arms. Stonewall pleaded no contest to violations of R.C. 2923.12(A)(2), which prohibits concealed carry, and R.C. 2923.16(B), which prohibits the improper handling of firearms in motor vehicles. These laws, as applied to Stonewall, directly limit his ability to lawfully possess a gun. *See Dist. of Columbia v. Heller*, 554 U.S. 570, 584 (2008) (defining the right to "bear arms" as the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the

---

[3] Although the State does not explicitly say so, the State's concession that *Bruen*'s first step is met in this case also constitutes a concession that Stonewall is one of "the people" the Second Amendment protects. The government has contested this point in other cases, but it does not do so here. *See, e.g., Reese*, 127 F.4th at 590-591.

purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person").

{¶52} Because Stonewall's conduct is presumptively protected by the Second Amendment, *Bruen* therefore places the burden on the State to demonstrate that its regulations, as applied to him, fall within the Nation's historic tradition of firearm regulation. *Bruen* at 18. To do so, the State must present historical analogues for both its concealed carry and improper handling laws. Whether the historical analogues are sufficient to justify the current application of Ohio's gun laws is determined based on their similarity to the current burdens and justifications of Ohio's regulatory scheme. *Id*. at 29-30. The starting point of *Bruen* analysis is therefore Ohio's current "how" and Ohio's current "why."

### A. The Burden of Ohio's Firearms Laws on Young Adults

{¶53} Ohio's system of firearms regulation imposes unique burdens on 18-to-20-year-olds. As a starting point, individuals in this age group may openly carry loaded firearms outside of the home. *See State v. Reed*, 2025-Ohio-4708, ¶ 27 (1st Dist.) (Crouse, J., concurring). They may not, however, carry firearms in a concealed manner, nor may they carry loaded firearms in areas of a vehicle that are accessible without getting out of the car. Ohio law therefore entrusts young adults with the responsibility of publicly possessing and displaying loaded guns, but denies them the ability to transport those weapons in handbags, pockets, or the passenger areas of cars.

{¶54} The State describes these restrictions as merely limiting the manner and not the ability of young adults to access firearms. While at first blush the impact of this statutory scheme on the right of armed self-defense for young people may seem minimal, the ability to openly carry a gun does not absolve the regulations of their force. As the Supreme Court noted in *Bruen*, a person is just as, if not more, likely to

be victimized by violence outside of the home than at home. *Bruen*, 597 U.S. at 33 ("Many Americans hazard greater danger outside the home than in it."). Individuals therefore have a need to protect themselves when they are away from their residences. *Id.* at 32-33. This need does not simply evaporate when a person enters a vehicle, a commonplace occurrence in states like Ohio where people often commute by car to work, school, and recreational activities.

**{¶55}** Rather, the need for armed self-defense is arguably heightened in a vehicle. As demonstrated by recent decisions from Ohio appellate courts, instances of violent "road rage" are not uncommon. *See, e.g., State v. Robinson*, 2025-Ohio-447, ¶ 8-10 (9th Dist.) (describing incident in which defendant followed victim at high rate of speed in his car and shot at her multiple times); *State v. Quintile*, 2024-Ohio-2026, ¶ 3-6 (9th Dist.) (describing incident in which defendant brandished a pistol at another motorist on a state roadway). Intimate partner violence can also involve patterns of stalking facilitated by automobiles. *See, e.g., Village of Chagrin Falls v. Ptak*, 2020-Ohio-5623, ¶ 12 (8th Dist.) (describing menacing-by-stalking incident in which defendant, who previously dated victim, followed victim in her car with his car to her apartment leasing office, to the side of the road, and to a Panera Bread location, causing her to fear he would harm her). No American is immune from the risk of violence while driving. In fact, former President Ronald Reagan was shot in the side while attempting to enter his presidential limousine, and former President John F. Kennedy was assassinated while riding in the back of a convertible. *See* Assassination Attempt, https://www.reaganlibrary.gov/permanent-exhibits/assassination-attempt (accessed Oct. 27, 2025) (noting that the bullet that penetrated President Ronald Reagan's left armpit ricocheted off his limousine as he was leaving a hotel); The President John F. Kennedy Assassination Records Collection,

https://www.archives.gov/research/jfk (accessed Oct. 27, 2025).

**{¶56}** Disarming young adults during periods of car ridership therefore imposes more than a minimal burden on the right of armed self-defense. This is so because there is a genuine need for self-defense in these situations and because the law deprives young adults of access to weapons during the time that it takes to secure a weapon outside of the vehicle's passenger area and during transport. R.C. 2923.16 therefore leaves young adults like Stonewall necessarily vulnerable to attack. While not constituting a total ban on firearm possession, Ohio's current "how" imposes a significant burden on the Second Amendment rights of young adults.

**{¶57}** Any proposed historical analogue must take into account the heavy weight of this burden. Contrary to the State's position, Ohio's concealed-carry and improper-handling statutes do not merely temporarily divest young adults of an otherwise robust right to openly carry firearms. Instead, they take away firearms from 18-to-20-year-olds at a time when they might need them most.

### B. The Justification for Ohio's Firearms Law as Applied to Young Adults

**{¶58}** To justify the significant burden its laws impose on the Second Amendment rights of young adults, Ohio offers but a single sentence: "when a society cannot trust someone with a firearm, that community has the right to limit their firearm rights." This is far from a sweeping justification of Ohio's current legislative judgment. In fact, to the extent it asserts that the State has a "right" to legislate, it might fairly be read as an assertion of law rather than a legislative explanation. But, to the extent it can be interpreted as a justification for Ohio's concealed-carry and improper-handling laws, as they apply to 18-to-20-year-olds, the statement leaves much to be desired.

23

**{¶59}** For starters, the sentence implies that the State disarms categories of people based on its level of trust in those individuals' firearm usage. It therefore invites the conclusion that the State distrusts 18-to-20-year-olds to responsibly use guns, since it has chosen to restrict their ability to carry concealed weapons and to possess loaded guns in vehicles. But if that is the case, why does the State permit this same group of people to openly carry loaded weapons? If 18-to-20-year-olds cannot be trusted with guns, shouldn't the State ban open carry by this category too? As these rhetorical questions expose, the underinclusivity of Ohio's regulations undercuts its asserted rationale.

**{¶60}** Even worse, the State has offered no evidence or information, either to the trial court or to us, to support its categorical judgment. In light of the fact that Ohio permits young adults to publicly possess loaded firearms, one might question why Ohio finds individuals in this age group to be untrustworthy with guns in cars, bookbags, or pockets.

**{¶61}** The Eighth Circuit addressed a somewhat similar problem with regard to Minnesota's justification for its prohibition on public carry by 18-to-20-year-olds in *Worth*, 108 F.4th at 694. There, the state suggested its regulation was justified because young adults are more dangerous than older adults, which it supported with statistics showing a higher homicide rate for individuals between ages 18 and 21. *Id.* But because these statistics were not in front of the legislature at the time it adopted the prohibition, the court concluded they could not have animated the law. *Id.* Setting aside this timing problem, the court also questioned the logic of the state's dangerousness calculation. *Id.* at 694-695. It noted that a number of state and federal laws already curtail firearm ownership by individuals known to pose a particular danger, regardless of age. *Id.* In light of these restrictions, there was no regulatory

24

benefit to be achieved from Minnesota's young adult public carry ban, as dangerous people were already restricted from engaging in Second Amendment conduct. *Id.* Thus, because the legislature did not actually rely on the statistics presented to the court and because the law it passed did not actually further its objective, the court concluded that Minnesota's law could not be justified by a dangerousness rationale. *Id.* at 695.

{¶62} While the Eighth Circuit did not label its analysis as a form of narrow tailoring, its reasoning admittedly mimics the type of means-ends scrutiny the Supreme Court rejected in *Bruen*. *Bruen*, 597 U.S. at 23-24. *Bruen* cautioned against an interest-balancing approach to the Second Amendment that measures a statute's burden on a protected interest in proportion to its impact on important governmental objectives. *Id.* In weighing the regulatory benefit to be achieved by Minnesota's law and the seriousness of Minnesota's asserted interest, the Eighth Circuit appeared to be scrutinizing the "ends" side of the forbidden means-end equation. But the Supreme Court declined certiorari review in *Worth*, thereby implying at least its tacit approval of *Worth*'s methodology. *See Jacobson*, 145 S.Ct. 1924. From this, we can glean that the *Worth* court properly scrutinized Minnesota's current legislative rationale, even in light of *Bruen*'s insistence that courts engage in analogical historic reasoning.

{¶63} Following this logic, it is clear that, even under *Bruen*, a court need not blindly accept any asserted justification for a firearms restriction. Rather, in examining a state's current justification, courts still retain all existing tools to determine the legitimacy and force of the government's asserted rationale. The difference that *Bruen* made to Second Amendment scrutiny is that a failed current justification can no longer be the stopping point. Prior to *Bruen*, some lower courts scrutinized the fit between the government's stated objective and its current firearms

regulation and went no further. *See Bruen* at 18-19, citing *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017). But after *Bruen*, analysis of the existing legislative rationale is just the beginning. Once that work is done and the current legislative objective is properly identified, courts must then take the additional step of comparing the modern and historical legislative bases to determine if the current law fits within the historic tradition of firearm regulation. *Bruen* at 18, 28-29.

{¶64} With that explanation in mind, I consider the meager justification Ohio asserted in this case for its concealed carry and improper handling laws as applied to young adults like Stonewall. Ohio has not explained why it trusts 18-to-20-year-olds with the responsibility of open carry but not the benefit of concealed carry. Nor has it explained why young adults can walk in public with guns but cannot drive with them.

{¶65} These are concepts I am unwilling to assume. For one thing, the burden is on the State to demonstrate its interest, and its single-sentence assertion is simply not enough to demonstrate anything. For another, courts should not manufacture legislative intent. This much has been clear since at least 1910, when the Ohio Supreme Court observed:

> The province of construction is to ascertain and give effect to the intention of the legislature, but this intent must be derived from the legislation and *may not be invented by the court.* To supply the intention and then give the statute effect according to such intention would not be construction but legislation.

(Emphasis added.) *State ex rel. Harness v. Roney*, 82 Ohio St. 376, 380 (1910).

{¶66} Just as Minnesota could not rely on dangerousness to explain its ban on public carry by young adults in *Worth*, Ohio cannot rely on trustworthiness to explain its concealed-carry and improper-handling laws as applied to those between 18 and 21

years of age.

### C. The Lack of Historical Analogues

{¶67} With Ohio's current "how and why" as reference points, I turn to the historical analogues the State presents as matches for the two statutes at issue in this case. Although the State offers no valid current justification for the challenged laws, it does attempt to draw from historic justifications for prohibiting firearm possession, which it contends are sufficiently analogous to its current statutory scheme to meet *Bruen*'s standards.

{¶68} The first such justification identified by the State is the disarmament of individuals thought to be dangerous. In this regard, the State argues that, because founding-era statutes permitted the temporary disarmament of dangerous people, the government today may assume that young adults, as a category, are more prone to violence and may disarm them as a result. There are a number of problems with this rationale.

{¶69} For one, the current and historic burdens are not relevantly similar. The founding-era tradition cited by the State involved periods of total disarmament based on an individualized determination of dangerousness. *See, e.g.*, Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794*, 16 Law & Hist. Rev. 567, 573-576 (1998). But the laws we analyze in Stonewall's case do not fully disarm young adults. To the contrary, Ohio permits young adults to openly carry firearms, while prohibiting them from doing so in a concealed manner or in a vehicle. No historic tradition supports presuming a category of persons to be dangerous and nonetheless allowing them access to firearms, but limiting the methods by which they may bear them. In other words, there is no underinclusive historic analogue.

**{¶70}** Another problem with the State's argument is that we lack confirmation the legislature indeed relied on a dangerousness justification when it enacted R.C. 2923.12 and R.C. 2923.16. Just as the Eighth Circuit discounted statistical evidence that was not before the legislature in *Worth*, we too should not consider interests the legislature may not have actually had. *Worth*, 108 F.4th at 694.

**{¶71}** The State also points to the historic treatment of young adults as "infants" under the control of their parents as a basis for limiting their access to guns today. *See, e.g.*, Act of Jan. 20, 1813, 2 Stat. 792, Ch. 13, § 5 (requiring parental consent for a person under 21 to enlist in the Army). It argues that, because 18-to-20-year-olds were treated as immature in the founding era, its current laws advance a public safety rationale, as immature individuals can be presumed to be untrustworthy with guns. But these proposed historic analogues suffer from identical problems to the founding-era dangerousness statutes, in that they do not track an interest the legislature actually advanced, nor do they model the current underinclusive burden that Ohio has adopted.

**{¶72}** Moreover, many of the historic infancy laws discussed by the State are irrelevant to our Second Amendment analysis. *Bruen* requires the government to identify a tradition of firearm regulation, and founding-era laws that regulate other conduct, such as family relationships or a person's legal status, inherently fall outside of this tradition. *See Bruen*, 597 U.S. at 18. Put simply, infancy laws regulate status, not firearms, and for this reason they do not count.

**{¶73}** With regard to its improper-handling law, the State next asserts that the colonies regulated how firearms were to be transported at the time the Second Amendment was ratified. *See, e.g.*, An Act to Prevent the hunting of deer, and other wild beasts, beyond the limits of the lands purchased of the Indians by the

Proprietaries of this Province, and Against Killing Deer out of Season (1760), § VI; Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred and Ten, p. 229, Image 288 (Vol. 1, 1810). But these laws are not relevantly similar to Ohio's improper-handling law because they are not comparably justified. Nowhere in the record before us did Ohio explain that it limits young people like Stonewall from transporting loaded weapons in cars because it believes them to present a public safety risk. Nor are these laws comparable in their burden. Unlike Ohio's category-based law, the colonial statutes cited by the State imposed limitations on all persons transporting certain weapons and equipment, implying that there was something unsafe about the armament or the condition and not the person. *See, e.g.*, Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City, p. 20, Image 21 (1763) (prohibiting the amount of gunpowder on public roads as of 1763 in New York). Flipping this equation around, Ohio law embodies the opposite assumption. Because some individuals are permitted to transport loaded firearms in vehicles, Ohio's regulatory scheme accepts that there are times when the transport of a loaded weapon presents no public safety risk. Unlike the colonial statutes, Ohio law removes the ability to transport weapons from certain people based on unexplained categorical judgments. This, therefore, is not a comparable burden.

{¶74} An even further problem with regard to all of Ohio's proposed historical analogues is that they are not relevantly similar to the State's prosecution of Stonewall. At a hearing on Stonewall's bond, the State alleged that Stonewall was a passenger in

29

a vehicle that was stopped for reasons unrelated to him and that he was found to be in possession of a bag containing a firearm. The State did not allege that Stonewall was dangerous, that he was an "infant" under the control of his parents, or that there was any particular danger that arose from the way he transported the gun. Thus, history does not support the deprivation of Stonewall's ability to possess a concealed weapon in a vehicle in this case.

{¶75} In sum, there is simply no historical analogue for Ohio's idiosyncratic gun laws as applied to young adults like Stonewall. I reach this conclusion in large part because Ohio provided no logical justification for why it enacted its current statutory scheme. Having no modern frame of reference makes the task of locating a historical statutory match difficult if not impossible. *Bruen* contemplated as much when it explained the importance of an embedded reference point. *Bruen*, 597 U.S. at 29. As the Court observed, a green truck and a green hat are only relevantly similar if the reference point is "things that are green," rather than "things you can wear." *Id.*

{¶76} Here we have no embedded reference point. Because Ohio's proposed trustworthiness rationale lacks present-day validity, no historic tradition of disarming untrustworthy young adults, even temporarily, can justify Ohio's regulatory scheme. And Ohio proposed no other current justification, so no other historical analogues are relevantly similar. We cannot compare history to nothing.

### III. Conclusion

{¶77} Ohio is to be commended for its efforts to reduce gun violence and gun accidents. These are important goals, ones we all share. But, according to the Supreme Court, the government's ability to regulate firearms-related conduct today is constrained by the laws of yesteryear. And I can find no historic counterpart for laws that have no valid current justification.

**{¶78}** I would sustain Stonewall's as-applied Second Amendment challenge on this basis.