[Cite as *State v. Matosky*, 2025-Ohio-5658.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30447 |
| Appellant | : | |
| | : | Trial Court Case No. 2024 CR 01417 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| MAKAYLEY NEVAEH JADE MATOSKY | : | Court) |
| | : | |
| Appellee | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on December 19, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

ROBERT G. HANSEMAN, JUDGE

EPLEY, P.J., and LEWIS, J., concur.

ANDREW T. FRENCH, Attorney for Appellant
CHARLES M. BLUE, Attorney for Appellee

HANSEMAN, J.

{¶ 1} The State of Ohio appeals from a judgment of the Montgomery County Court of Common Pleas that granted the motion of Makayley Nevaeh Jade Matosky to dismiss her indictment for carrying concealed weapons in violation of R.C. 2923.12(A)(2) and improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B). The State claims the dismissal of Matosky's indictment was improper because the trial court erroneously determined that R.C. 2923.12(A)(2) and 2923.16(B) are unconstitutional as applied to Matosky. For the reasons outlined below, we disagree with the State and affirm the judgment of the trial court.

**Course of Proceedings and Relevant Statutory Scheme**

{¶ 2} On August 8, 2024, a Montgomery County grand jury returned an indictment charging Matosky with carrying concealed weapons in violation of R.C. 2923.12(A)(2), which provides: "No person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, . . . [a] handgun other than a dangerous ordnance." Matosky was also charged with improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), which provides: "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or any passenger without leaving the vehicle." Matosky subsequently moved to dismiss the charges on grounds that R.C. 2923.12(A)(2) and 2923.16(B) are unconstitutional as applied to her because they violate her Second Amendment right to bear arms.

{¶ 3} In order to explain the basis of Matosky's constitutional argument, we first note that the prohibitions in R.C. 2923.12(A)(2) and 2923.16(B) do not apply to individuals with a valid concealed handgun license. R.C. 2923.12(C)(2) and 2923.16(F)(5)(a); *State v. Barber*, 2025-Ohio-1193, ¶ 24 (1st Dist.). A person with a concealed handgun license is exempt from criminal liability under these statutes. *State v. Stonewall*, 2025-Ohio-4974, ¶ 3 (1st Dist.).

{¶ 4} R.C. 2923.111 allows a "qualifying adult" to carry a concealed handgun "anywhere in this state in which a person who has been issued a concealed handgun license may carry a concealed handgun." R.C. 2923.111(B)(2). "Qualifying adults" need not possess a concealed handgun license to carry a concealed firearm and are "treated as though they possess[ ] a concealed handgun license." *State v. Storms*, 2024-Ohio-1954, ¶ 21 (1st Dist.). As such, a "qualifying adult" is exempt from criminal liability under R.C. 2923.12(A)(2) and 2923.16(B). *Barber* at ¶ 26 ("[a]s a result of R.C. 2923.111, a 'qualifying adult' is deemed to possess a valid concealed handgun license and is not subject to prosecution for a violation of R.C. 2923.12(A)(2) or 2923.16(B)").

{¶ 5} A "qualifying adult" is defined as a person who is all the following:

(a) Twenty-one years of age or older;

(b) Not legally prohibited from possessing or receiving a firearm under 18 U.S.C. 922(g)(1) to (9) or under section 2923.13 of the Revised Code or any other Revised Code provision;

(c) Satisfies all of the criteria listed in divisions (D)(1)(a) to (j), (m), (p), (q), and (s) of section 2923.125 of the Revised Code.

R.C. 2923.111(A)(2)(a)-(c).

{¶ 6} At the time of the indicted offenses in this case, Matosky was approximately 10 weeks shy of her 21st birthday. For the purpose of Matosky's motion to dismiss, the parties

3

stipulated that "Matosky met all requirements to be a 'qualifying adult,' as defined in R.C. 2923.111(A)(2), *with the sole exception being that Matosky had not yet attained the age of twenty-one years*." (Emphasis added.) Stipulation for Motion to Dismiss. Because of this, Matosky was not a "qualifying adult" and subject to prosecution under R.C. 2923.12(A)(2) and 2923.16(B).

{¶ 7} In her motion to dismiss, Matosky argued that, as applied to her, the age-based restriction applicable to violations of R.C. 2923.12(A)(2) and 2923.16(B) infringed her Second Amendment right to bear arms. When ruling on Matosky's motion, the trial court applied the two-part test for analyzing Second Amendment challenges set forth in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022). After applying *Bruen's* two-part test, the trial court found that R.C. 2923.12, 2923.16, and 2923.111 are unconstitutional as applied to Matosky. Accordingly, the trial court sustained Matosky's motion and dismissed the concealed-carry and improper-handling charges against her.

{¶ 8} Under the authority of R.C. 2945.67(A), the State now appeals from the trial court's judgment dismissing Matosky's charges and raises two assignments of error for review.

**Standard of Review**

{¶ 9} "Generally, appellate courts conduct a de novo review of a trial court's decision concerning a defendant's motion to dismiss all or part of an indictment based upon a constitutional challenge to the statute under which the defendant stands indicted." (Citations omitted.) *State v. Lawson*, 2025-Ohio-2650, ¶ 5 (4th Dist.); *State v. Shingleton*, 2022-Ohio-4740, ¶ 34 (2d Dist.) ("a decision on 'whether a statute or ordinance is constitutional is a question of law that we review de novo'"), quoting *Cleveland v. State*, 2019-Ohio-3820, ¶ 15; *State v. Hall*, 2025-Ohio-1644, ¶ 29 (1st Dist.) ("[w]hether charges in an indictment should

4

be dismissed on constitutional grounds is a question of law, which this court reviews de novo"). "In de novo review, we independently review trial court decisions and accord them no deference." (Citation omitted.) *Coldly v. Fuyao Glass America, Inc.*, 2022-Ohio-1960, ¶ 9 (2d Dist.).

### The Second Amendment and the Two-Part Test in *Bruen*

{¶ 10} The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Fourteenth Amendment to the United States Constitution makes the Second Amendment right to keep and bear arms fully applicable to the States. *McDonald v. Chicago*, 561 U.S. 742 (2010).

{¶ 11} "[T]he right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 602 U.S. 680, 690 (2024), quoting *McDonald* at 778. "'Like most rights,' though, 'the right secured by the Second Amendment is not unlimited.'" *Id.* at 690-691, quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). That is, it is "'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id*. at 691, quoting *Heller* at 626. The right to bear arms has always been subject to regulations. *Id*. However, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Id*., quoting *Bruen*, 597 U.S. at 24.

{¶ 12} In *Bruen*, the United States Supreme Court set forth a two-part test that courts must apply when determining whether a firearm regulation violates the Second Amendment. *Bruen* at 8-22. Under the first part of the test, a court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id*. at 17. If it does, "the Constitution presumptively protects that conduct" and the burden then shifts to the government to justify

5

the firearm regulation by demonstrating that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*.

{¶ 13} In making the historical-tradition determination, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi* at 692, citing *Bruen* at 26-31. To do this, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id*., quoting *Bruen* at 29. Central to this inquiry is "[w]hy and how the regulation burdens the right." *Id*., citing *Bruen* at 29. "For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id*.

{¶ 14} The "*Bruen* analysis is therefore, at its core, a comparative endeavor. It compares the current 'how and why' against the historic 'how and why' to determine whether the government's modern firearm restrictions comport with the Nation's tradition of Second Amendment regulation." *Stonewall*, 2025-Ohio-4974 at ¶ 50 (1st Dist.) (Kinsley, P.J., dissenting), citing *Bruen,* 597 U.S. at 29. However, "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Rahimi*, 602 U.S. at 692, quoting *Bruen* at 30. "[I]t need not be a 'dead ringer' or a 'historical twin.'" (Emphasis deleted.) *Id*., quoting *Bruen* at 30.

{¶ 15} *Bruen* indicated that the founding era is a critical period from which to determine the historical tradition of firearm regulation and that courts should prioritize founding-era history. *Bruen* at 34-37; *Worth v. Jacobson*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history"), *cert. denied*,

6

_ U.S. _, 145 S.Ct. 1924 (2025). *Bruen* recognized that "'where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision.'" *Bruen* at 36, quoting *NLRB v. Noel Canning,* 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment). After *Bruen*, the United States Supreme Court in *Rahimi* further indicated the importance of founding-era history where it stated that "[e]ven when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right *if it does so to an extent beyond what was done at the founding*." (Emphasis added.) *Rahimi* at 692.

**First Assignment of Error**

{¶ 16} Under its first assignment of error, the State claims the trial court erred by finding the concealed-carry statute, R.C. 2923.12(A)(2), unconstitutional as applied to Matosky. In arguing that the statute is constitutionally valid, the State focuses on the second prong of the two-part test in *Bruen*. The State asserts that age-based restrictions on the right to bear arms are historically rooted in the Nation's historical tradition of firearm regulation and that the trial court erred by finding otherwise. Based on this premise, the State claims that Ohio's age restriction on the ability to carry concealed weapons does not violate Matosky's Second Amendment right to bear arms. The State also claims that the Nation has a historical tradition of restricting the right to carry concealed weapons as long as open carry is still permitted, and argues that Ohio's age restriction on concealed carry should be upheld as constitutional because it does not prohibit Matosky from openly carrying a firearm in public.

{¶ 17} The State does not challenge the application of the first prong of *Bruen*, which is that the plain text of the Second Amendment covers Matosky's conduct. As previously discussed, the Second Amendment protects the right of "the people" to bear arms. The

7

United States Supreme Court has explained that "the people" is a term that "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. There is ample federal case law holding that individuals who are 18 to 20 years old are among "the people" protected by the Second Amendment. *See, e.g.*, *Worth* at 689; *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 127 F.4th 583, 595 (5th Cir. 2025); *Lara v. Commr. Pennsylvania State Police*, 125 F.4th 428, 437-438 (3rd Cir. 2025), *petition for cert. filed sub nom. Paris v. Second Amendment Found., Inc.*, No. 24-1329 (U.S. June 26, 2025); *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 115-116 (10th Cir. 2024). Therefore, 20-year-old Matosky is among "the people" protected by the Second Amendment and her conduct of carrying a firearm is covered by the plain text of the amendment.

{¶ 18} The crux of this case is the second part of the *Bruen* test—whether Ohio's age restriction on carrying concealed weapons is consistent with the Nation's historical tradition of firearm regulation. In proceeding with the historical-tradition analysis, we must determine whether Ohio's age-based restriction on carrying concealed weapons is relevantly similar to laws that the Nation permitted during the founding era. In other words, we must determine whether similar age-based restrictions were imposed during the founding era for similar reasons.

{¶ 19} Several federal circuit courts have applied *Bruen's* historical-tradition analysis to contemporary age-based firearm restrictions. *See, e.g., Reese*; *Worth*,108 F.4th 677; *McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568 (4th Cir. 2025), *petition for cert. filed*, No. 25-24 (U.S. July 3, 2025); *Natl. Rifle Assoc. v. Bondi*, 133 F.4th 1108, (11th Cir. 2025), *petition for cert. filed sub nom. Natl. Rifle Assoc. v. Glass*, No. 24-1185 (U.S. May 16, 2025). The opinions of those courts, however, conflict. Some hold that

8

modern restrictions banning 18- to 20-year-olds from either possessing or purchasing firearms are within the Nation's historical tradition of firearm regulation, while others hold the opposite. *See, e.g.*, *Reese* (holding that federal ban on commercial sale of handguns to 18- to 20-year-olds violated the Second Amendment because the restriction was inconsistent with the Nation's historic tradition of firearm regulation); *McCoy* (holding that the same federal ban on commercial sale of handguns to 18- to 20-year-olds discussed in *Reese* was constitutional on grounds that the Nation's tradition of firearm regulation permitted restrictions on the sale of firearms to individuals under the age of 21); *Worth* (holding that a Minnesota statute banning 18- to 20-year-olds from carrying handguns in public for self-defense violated the Second Amendment because such a restriction was not within the Nation's historical tradition of firearm regulation); *Bondi* (holding that a Florida statute prohibiting people between the ages of 18 and 21 from purchasing firearms was constitutional because it was consistent with the Nation's historical tradition of firearm regulation); *Lara* (holding that Pennsylvania law preventing 18- to 20-year-olds from openly carrying firearms during state- or municipal-declared emergencies was unconstitutional because it was inconsistent with Nation's historic tradition of firearm regulation).

{¶ 20} Although these federal cases conflict and do not specifically address age restrictions on the concealed carry of firearms, they are helpful in that they provide an abundance of relevant information regarding historical age-based firearm regulations. The following is a non-exhaustive summary of the historical information that we gleaned from these cases.

{¶ 21} "The common law 'is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Worth* at 695, quoting *Bruen*, 597 U.S. at 19. "The 'age of majority at twenty-one was early established at common law' and evolved 'from

9

the system of judicial combat and knight service, the age of knighthood being increased . . . to the completion of twenty years.'" *Bondi* at 1117, quoting T.E. James, *The Age of Majority*, 4 Am. J. Legal Hist. 22, 30 (1960). "English law set the age of majority at 21 years of age because of the relative lack of maturity and judgment of younger individuals." *Id*., citing 1 William Blackstone, *Commentaries on the Laws of England*, 453 (George Sharswood Ed. 1893). "At English common law, a person under the age of 21 was considered an 'infant' for purposes of contracting, and infants were not bound by their contracts." *McCoy* at 575.

{¶ 22} "Like many common law principles, the infancy doctrine made its way across the Atlantic, and early American courts routinely applied it." *McCoy*, 140 F.4th at 575. "[T]he colonies 'adopted age twenty-one as the near universal age of majority.'" *Bondi,* 133 F.4th at 1117, quoting Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016). Therefore, "[a]t the Founding, a person was an 'infant[ ]' or a 'minor[ ]' in the eyes of the law until age 21." *Id.*, quoting 1 Zephaniah Swift, *A System of the Laws of the State of Connecticut,* 213 (1795). "It was only once an individual 'attain[ed] his majority at the age of twenty-one years accomplished,' that he came into 'the full enjoyment of his civil and political rights.'" *State v. Reed*, 2025-Ohio-4708, ¶ 13 (1st Dist.) (Crouse, P.J., concurring separately), quoting 1 Bouvier, *Institutes of American Law*, § 363 (1854). "Prior to that time, infants lacked the ability to participate in the legal and economic life of the community." *Id*. Accordingly, "[t]he infancy doctrine imposed a severe burden on a minor's ability to purchase goods, including firearms, during the founding era." *McCoy* at 576.

{¶ 23} The Uniform Militia Act of 1792 was "passed shortly after the Second Amendment was ratified" and it "required eighteen-year-olds to enroll in the militia, and militia members were required to furnish their own weapons." *Reese,*127 F.4th at 596, citing Act of May 8, 1792, Ch. 33, 1 Stat. 271. "Because of the legal incapacity of individuals under the

10

age of 21, states enacted laws at the Founding to address minors' inability to purchase firearms required for their militia service." *Bondi* at 1119. "By 1826, at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population—had enacted laws that placed the onus on parents to provide minors with firearms for militia service." *Id.* at 1120.

{¶ 24} "Mid-to-late-nineteenth-century laws . . . further establish that our law historically precluded the purchase of firearms by individuals under the age of 21. In the second half of the nineteenth century, 20 jurisdictions enacted laws that restricted access to arms for minors. Most of those laws prohibited all methods of providing arms to individuals under the age of 21. And only a few of these laws allowed parents to provide arms to their children." *Bondi* at 1121. The State included an extensive list of these laws within its appellate brief.

{¶ 25} The foregoing non-exhaustive history indicates that the Nation has a historical tradition of restricting or burdening the ability of minors to access and purchase firearms. This historical tradition, however, "tells us, at most, that legal infancy was the status permitting a restriction on infant's rights and that 21 years was the age on which the founding-era legislatures happened to settle at the time." *Reed*, 2025-Ohio-4708 at ¶ 36 (1st Dist.) (Bock, J., concurring in part and dissenting in part).

{¶ 26} Currently, in Ohio, the "[a]ge of majority" is "[a]ll persons of the age of eighteen years or more, who are under no legal disability." R.C. 3109.01. These persons "are capable of contracting and are of full age for all purposes." *Id*. Therefore, "eighteen- to twenty-one-year-olds . . . today are analogous to adults, not minors, at the time these [founding-era] statutes were enacted." *Bondi*, 133 F.4th at 1185 (Brasher, J., dissenting).

**{¶ 27}** Judge Crouse from Ohio's First Appellate District aptly concluded in her concurring opinion in *Reed* that "the age of majority, not age 21, provides the relevant constitutional line," because "[h]istory suggests that founding-era limitations on firearm rights were imposed not because of any judgment that those under 21 years of age were dangerous with arms, but because those under 21 were under the legal limitations inherent in minority, and under the legal care and protection of a guardian or parent." *Reed* at ¶ 17 (Crouse, P.J., concurring separately). Judge Crouse provides sound reasoning in support of this conclusion:

> *First*, . . . no state prior to the 1880s prohibited infants from possessing guns. While it may have been difficult for founding-era 18-to-20-year-olds to obtain weapons, they were generally permitted to have them if they could get them. This suggests that the line drawn at 21 was not a categorical determination of dangerousness, but an incidental effect of legal minority and restrictions on economic rights.
>
> *Second*, numerous legal writers in the 18th- and 19th-centuries emphasized that the 21-year threshold for legal majority was not rooted in hard-nosed assessments of danger with firearms. Instead, they acknowledged the somewhat arbitrary product of tradition. Blackstone noted that the age of majority was "merely arbitrary, and juris positivi [i.e., of positive law]," fixed "by the constitutions of different kingdoms . . . at different times." [1 Blackstone, *Commentaries on the Laws of England*, 452 (1765)]. New York Chancellor James Kent likewise described the 21-year line more as an arbitrary legal threshold than a concrete determination about maturity. *See* [2 Kent, *Commentaries on American Law*, 171 (1827)]

12

("the age of majority . . . has been variously established in different countries, but with us is fixed at the age of twenty-one"). And John Bouvier, author of America's first major legal dictionary, wrote of how the law "fixed" an age of majority that was "uniform as to all," despite the reality that "[t]he age at which man no longer requires aid and advice for his conduct, is not the same in every individual; some being precocious, and others slow at arriving at maturity." [1 Bouvier, *Institutes of American Law*, § 337 (1854)]. In fact, modern legal historians have suggested that the common law shifted the age of majority from 14 or 15 years to 20 or 21 years during the medieval period, not because of shifting conceptions of maturity, but in order to accommodate the "weight of the arms" worn by adult knights. *See* James, *The Age of Majority*, 4 Am. J. Legal Hist. 22, 30 (1960); *see also Hamilton*, 91 Tul. L. Rev. at 63-64.

*Third*, a close examination of the Uniform Militia Act of 1792 . . . and accompanying state laws further reinforces that any firearms disabilities experienced by those under 21 were not safety-related, but were legal incidents of infancy . . . Compulsory enrollment of those under 21 suggests that the Second Congress believed 18-to-20-year-olds could, at least in certain circumstances, be trusted to keep and carry weapons. And this generally meant trusting them to keep those arms in their homes, as militia weapons were generally furnished, kept, and maintained by the individual militiamen. *See* Cornell & DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.Rev. 487, 509-10 (2004); 15 Kopel & Greenlee, *The Second Amendment Rights of Young Adults*, 43

13

S.Ill.Univ.L.J. 496, 501 (2019) ("American militiamen were expected to keep their own arms at home, and to be proficient with those arms.").

. . .

In sum, the history suggests that individuals aged 18 to 20 were not deemed too dangerous to bear arms at the founding. They were merely hindered in securing arms by the limitations imposed on their legal and economic autonomy, because of their age and dependence upon their parents or guardians. The Uniform Militia Act showed that the founding generation felt 18-to-20-year-olds *could* be trusted to keep weapons in their homes, if only the State would help them to circumvent common-law difficulties relating to legal minority.

Any tradition of firearm restrictions based on age and infancy, therefore, should be viewed as tied to the line between minority and majority, not to the line between 20 and 21 years. Minors today, like infants at the founding, are in the custody of a parent and/or guardian. . . .

Individuals who . . . are between the ages of 18 and 20, are not minors today. Such individuals enjoy effectively full legal rights and autonomy. They can participate freely in the economic and legal life of the community and have the right to vote. *See* U.S. Const., amend. XIX. Most significantly, the law leaves 18-to-20-year-olds today only themselves to depend upon for aid and protection.

*Reed* at ¶ 18-24.

{¶ 28} We agree with Judge Crouse's reasoning and find that while there may be a historical tradition of restricting minors' access to firearms, Matosky was not a minor at the

time of the charged offenses. Rather, Matosky was at the age of majority—a legal adult—and there is no analogous historical tradition of restricting a legal adult's right to bear arms based solely on the adult's age.

{¶ 29} In *Stonewall*, the First District Court of Appeals recently upheld the constitutionality of the concealed-carry age restriction in question. *Stonewall*, 2025-Ohio-4974 (1st Dist.). In so holding, the court found that there is a historical tradition of prohibiting the concealed carry of weapons so long as open carry is not similarly prohibited. *Id*. at ¶ 23-24, citing *Bruen*, 597 U.S. at 52-55. The First District also found that the purpose behind the historical tradition of banning concealed carry of weapons "was to reduce the risk of surprise attacks from hidden weapons, while leaving untouched the right to carry openly for self defense." *Id*., citing *Hall*, 2025-Ohio-1644 at ¶ 57 (1st Dist.). The First District presumably found that this historical purpose was consistent with the purpose behind Ohio banning individuals under 21 from carrying concealed weapons, as it stated that the age restriction "fit within our historical tradition and was constitutional." *Id*. at ¶ 24. The court reached this conclusion because the restriction did not prevent the 19-year-old defendant from exercising his Second Amendment right to carry a handgun in public. *Id*. at ¶ 25. The court thus determined that Ohio's concealed-carry statute was constitutional as applied to the 19-year-old defendant. *Id*. at ¶ 24-26.

{¶ 30} We agree that there is a historical tradition of prohibiting the concealed carry of weapons. *Bruen* explained that historical evidence established "the manner of public carry was subject to reasonable regulation" and that "States could lawfully eliminate . . . concealed carry—so long as they left open the option to carry openly." (Emphasis deleted.) *Bruen* at 59. However, as we previously discussed, a modern firearm regulation may not be compatible with the historic tradition of firearm regulation if it goes "beyond what was done

at the founding." *Rahimi*, 602 U.S. at 692. Modern firearm regulations must be "'relevantly similar' to laws that our tradition is understood to permit." *Id*., quoting *Bruen* at 29. Therefore, a modern firearm regulation will not offend the Second Amendment if it imposes restrictions for similar reasons as founding-era regulations. *Id*. "Because *Bruen* required a modern law to be relevantly similar to the Nation's historical tradition in both how and why it restricts the right to bear arms, if modern day laws do not regulate firearms for relevantly similar reasons, those laws are unconstitutional under *Bruen* and *Rahimi*." *Reed*, 2025-Ohio-4708 at ¶ 42 (1st Dist.) (Bock, J., concurring in part and dissenting in part).

{¶ 31} Under Ohio's current statutory scheme, individuals under 21 years of age may openly carry loaded firearms, but they do not have the right to carry concealed firearms. "Ohio law therefore entrusts young adults with the responsibility of publicly possessing and displaying loaded guns, but denies them the ability to transport those weapons in handbags, pockets, or the passenger area of cars." *Stonewall*, 2025-Ohio-4974 at ¶ 53 (1st Dist.) (Kinsley, P.J., dissenting). In addition to the age restriction, there are other categories of individuals who are prohibited from carrying concealed weapons. For example, fugitives from justice, certain felons and misdemeanants, individuals deemed mentally ill per court order, and individuals who are otherwise prohibited from legally possessing firearms under state or federal law are other categories of individuals who are prohibited from carrying concealed weapons because they are not "qualifying adults." *See* R.C. 2923.111(A)(2).

{¶ 32} This statutory scheme indicates that: "Ohio does not regulate the right to carry a concealed gun because it views doing so as dangerous; rather, it regulates *specific people's* right to carry a concealed weapon based on the State's belief that certain people are more dangerous than other people and therefore are not safe to carry a concealed weapon." (Emphasis in original.) *Reed* at ¶ 45 (Bock, J., concurring in part and dissenting in

16

part). The First District Court of Appeals has recognized that "by permitting most Ohio adults to carry concealed weapons, without having to take any steps to obtain a concealed-carry license, it is clear that Ohio has departed from the view that the simple act of carrying a concealed weapon is itself dangerous." *Barber*, 2025-Ohio-1193 at ¶ 55 (1st Dist.).

{¶ 33} From this we can discern that the "why" behind the age-based restriction at issue is a presumption that individuals under 21 are more dangerous and cannot be trusted to carry concealed weapons. This is markedly different from the "why" behind the historical bans on concealed carry of weapons, which was to reduce the risk of surprise attacks from hidden weapons carried by anyone. Accordingly, the "why" behind Ohio's age-based restriction on the concealed carry of weapons goes beyond the historical tradition in that it bans concealed carry of weapons based on the perception of a category of people as dangerous, not because the act of carrying concealed weapons is dangerous.

{¶ 34} Although Ohio may impose restrictions on Matosky's Second Amendment rights that are similar to restrictions imposed in historical laws, we find that that its justification for the statutes in this case is not relevantly similar to the reasons behind the historical laws. "No historic tradition supports presuming a category of persons to be dangerous and nonetheless allowing them access to firearms, but limiting the methods by which they may bear them." *Stonewall* at ¶ 69 (Kinsley, P.J., dissenting). Accordingly, there is no historical analogue.

{¶ 35} We note that in *Rahimi*, the United States Supreme Court determined that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Rahimi,* 602 U.S. at 700. The State in this case, however, has failed to present any evidence establishing that adults 18 to 20 years old, simply as a general age group, present a credible threat to the physical safety of others.

17

Accordingly, the ban on carrying concealed weapons for this age group cannot be justified based on the dangerousness rationale in *Rahimi*. *See Worth*, 108 F.4th at 695.

{¶ 36} For all the foregoing reasons, we find that the State has failed its burden to demonstrate that Ohio's age-based restriction on carrying concealed weapons is consistent with the Nation's historical tradition of firearm regulation. Accordingly, we find that the concealed-carry statute, R.C. 2923.12, and its counterpart, R.C. 2923.111, are unconstitutional as applied to Matosky.

{¶ 37} The State's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 38} Under its second assignment of error, the State claims the trial court erred by finding the improper-handling statute, R.C. 2923.16(B), unconstitutional as applied to Matosky. In support of this claim, the State raises the same historical-tradition argument that it raised under its first assignment of error.

{¶ 39} Matosky was subject to criminal liability under R.C. 2923.16(B) because she was under 21 years of age at the time she was found to have an accessible, loaded firearm in her motor vehicle. Matosky claims that Ohio's age-based restriction on this conduct violates her Second Amendment right to bear arms. The State, on the other hand, maintains that the restriction is consistent with the Nation's historical tradition of firearm regulation and does not offend the Second Amendment.

{¶ 40} To address the State's historical-tradition argument, we fully incorporate our analysis set forth under the State's first assignment of error. We again find that although there may be a historical tradition of restricting minors' access to firearms, Matosky was a legal adult at the time of the charged offenses and there is no analogous historical tradition of restricting a legal adult's right to bear arms based solely on the adult's age. We also again

18

find that the dangerousness rationale under *Rahimi*—that there is a historical tradition of disarming individuals who present a credible threat to the physical safety of others—does not apply because there is no evidence establishing that adults under 21 years of age present a credible threat to the physical safety of others.

{¶ 41} Also, as motor vehicles did not exist during the founding era, the State acknowledges that there is no historical regulation that is directly analogous to Ohio's age-based restriction on having a loaded, accessible firearm in a motor vehicle. The State also acknowledges that there is a lack of historical stagecoach or wagon laws from the founding era that regulated the transport of firearms. Nevertheless, the State argues that a "historical twin" is not required, and posits that Ohio's age-based restriction on having a loaded, accessible firearm in a motor vehicle should be analogized to historical regulations that pertain to the safe handling and use of firearms. Despite this argument, the State does not cite any specific historical regulations pertaining to the safe handling or use of firearms, let alone any regulation that mirrors the age-based restriction at issue. Instead, the State cites federal case law that generally shows a historical tradition of firearm regulations designed to protect public safety, such as regulations that require guns to be registered, gun owners to attend training, and firearms and gun powder to be stored in a certain manner.

{¶ 42} We do not find that the types of historical regulations cited by the State are relevantly similar to the age-based restriction at issue. The restriction prevents a category of people perceived as dangerous based on their age alone from having or transporting a loaded, accessible firearm in a motor vehicle. The restriction is markedly different from general safety regulations on how to handle and use firearms. The specific conduct regulated by the restriction is not the same, and the danger that it addresses is different as well. The age-based restriction addresses danger posed by a category of people, whereas

19

historical firearm safety and use regulations address danger from the firearm itself. How and why those historical regulations restrict the right to bear arms is not relevantly similar to the statutes contested in this case.

{¶ 43} Because the State has not pointed to any relevantly similar historical regulation, we find that the State has failed its burden to demonstrate that Ohio's age-based restriction on having and transporting accessible, loaded firearms in a motor vehicle is consistent with the Nation's historical tradition of firearm regulation. We conclude that the improper-handling statute, R.C. 2923.16, and its counterpart, R.C. 2923.111, are unconstitutional as applied to Matosky.

{¶ 44} The State's second assignment of error is overruled.

## Conclusion

{¶ 45} Having overruled both assignments of error raised by the State, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J., and LEWIS, J., concur.